[No. 41264. En Banc. November 4, 1971.]

JERAULD D. MILLER, *Respondent*, v. THE ARGUS PUBLISHING COMPANY, *Appellant*.

*Ashley, Foster, Pepper & Riviera* and *Camden M. Hall,* for appellant.

*DeGarmo, Leedy, Oles & Morrison* and *Richard M. Stanislaw,* for respondent.

NEILL, J.—Defendant appeals from a verdict and judgment for plaintiff in a libel action. Plaintiff is engaged in the business of public relations and advertising, including presentation of political candidates and issues. In plaintiff's words, his job in a political campaign is "to try to sell the candidate" to the voting public.

Defendant publishes *Argus,* a weekly newsmagazine in tabloid form. *Argus* declares itself an "independent journal of comment and opinion," which focuses on politics, business and the arts, taking strong stands on public issues and candidates and urging its readers to follow its judgment. According to its publisher, "ARGUS is unique in its field. It presently has some 20,000 readers who comprise the power elite of the area . . . [including] a good segment of the liberal intellectual community. Major political office holders, including the chief executive, senators and congressmen are ARGUS subscribers." This readership closely coincides with the segment of the public from which plaintiff would draw his political clientele.

In November, 1967, and February, 1968, *Argus* carried front page articles concerning plaintiff, written by a free-lance writer. The November article asserted that plaintiff was "a big loser" in recent Seattle City Council elections in that "his candidates" lost despite lavish spending; suggested that the "Miller-style effort" works best where the people are bored and where plaintiff was best able to use lavish financing and deceptive practices; and concluded that, although plaintiff's candidates lost, he "probably is crying all the way to the bank."[1]

---

[1] The complete text of the November article is:
"Spenders Lose Local Elections

"A big loser in the recent elections, public relations operative *Jerry Miller* wasn't on the ballot; but his candidates for City Council were, and they lost. It was bad enough that incumbent *Ed Riley* failed

Following publication of the November article, plaintiff personally complained to the publisher and demanded that *Argus* "refrain from further libeling me." Some weeks later, the February article was published, in which plaintiff was referred to as one "whose specialty heretofore has been losing right-wing causes and candidates," and who had alienated his politically moderate brother by his "flag-waving slant."[2]

We deem the recent holding of the United States

to get past the primary despite an expensive multi-colored ad campaign, reportedly inspired by a flour product's success and using the same technique. But then *E. A. 'Eddie' Black* ran one of the costliest Council races in Seattle history, splurging in every advertising medium but the ones that count most—doorbelling and solid issues—and was beaten by a manifestly unflappable young whippersnapper, *Tim Hill.*

"And finally, even with this year's widespread feeling against incumbents, and with a concrete war-chest as large as Black's, Miller-tutored candidate *Bob Wartelle* was defeated two-to-one by Councilman *Ted Best.*

"It is said Mr. Miller had a hand also in the covert Freeholders campaign of the King County GOP organization, a contest about which people tended to be bored until the last minute, which is probably the best kind of atmosphere in which a Miller-style effort can produce; and indeed almost half the King County GOP slate did get in. How? By organizing a *'bipartisan'* committee to endorse a 'bipartisan' slate, the vast majority of whom were not only from one party, but one faction of that party. Then there were committee names that sounded strangely familiar: e.g., *'Metro League'* (Muny League?). And when some of the press began to catch up to that, still other familiar-*sounding* committees were formed. All lavishly financed by newspaper ads.

"The same bag of tricks was opened in the Black campaign, but there the voters were better informed ahead of time.

*"All in all, it was a pretty inglorious record for one of the brighter PR pros in town, although, considering that even losers pay commissions, Mr. Miller, like Liberace, probably is crying all the way to the bank. What's more, we understand he has the account for Referendum 35—to repeal the state's already toothless anti-housing discrimination law. Hold your breath."*

[2]The text of the February article is:
"New Magazine?
"The irreverent local hippie newspaper, *Helix*, reports that Seattle public-relations man *Jerauld D. Miller*, whose specialty heretofore has been losing right-wing causes and candidates, is planning publication of a new regional magazine to compete with KING's *Seattle*, which Miller and team consider too liberal.

"For some months Miller. and his brother, Roger, published *Image*

Supreme Court in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971), to be determinative, requiring us to reverse and remand this case. In view of this ultimate disposition, some of defendant's assignments of error need not be discussed. However, before examining the impact of *Rosenbloom*, we will consider those assignments of error involving issues which may arise on a retrial.

■ We deal first with the contention that, as a matter of law, the articles were not defamatory. The trial court determined that the articles were capable of a defamatory meaning, and submitted to the jury the issue of whether they were in fact defamatory.[3] We have approved this pro-

---

*Northwest* out of Everett, until Roger, a political moderate, was alienated by Jerauld's flag-waving slant and quit. *Image's* last issue was in December; according to *Helix* the new publication-attempt is scheduled for March.

"*Helix*, incidentally, intends to urge the hippie vote to give Forward Thrust a cold shoulder. '*Seattle*,' says an editorial by Walt Crowley, '*is like a patient with terminal cancer. Do you let the disease run its natural course and hope Seattle's successor does better, or do you prolong a shadow of life?*' "

[3]The trial court's instructions adequately set forth the law, the respective burdens of proof, and the jury's function in this area. Instruction No. 4 pertained to the jury function of determining whether the articles were, in fact, defamatory:

"Libel" in the contemplation of the law is a written defamatory or slanderous statement which tends to expose a living person to hatred, contempt, ridicule or disgrace or to deprive him of the benefit of public confidence or social intercourse or to injure him in connection with his business, profession or occupation.

The plaintiff has the burden of proving, by a fair preponderance of the evidence, that the publication complained of constituted a "libel" under the law as I have defined that term for you.

The plaintiff also has the burden of establishing, by a fair preponderance of the evidence, that damage was proximately caused to him by the alleged libel. The term "proximate cause" means that cause which in a direct, unbroken sequence produced the damage complained of and without which such damage would not have happened. If the plaintiff carries the burden of proof by a fair preponderance of the evidence on the question of whether or not the articles in question libeled him and upon the question of damage, then the defendant has the burden, if it is to receive a favorable verdict, of establishing one of its affirmative defenses by a fair preponderance of the evidence.

The trial court's instruction No. 6 pertained to the jury's additional

cedure and held that a jury verdict will not be disturbed so long as there was sufficient evidence to support an affirmative finding on the issue.[4] *Accord: Getchell v. Auto Bar Systems Northwest, Inc.,* 73 Wn.2d 831, 440 P.2d 843 (1968); *Purvis v. Bremer's, Inc.,* 54 Wn.2d 743, 344 P.2d 705 (1959). We are of the opinion that the evidence is sufficient to support a jury finding that the articles, read as a whole and given their ordinary meaning, were defamatory and libelous per se. *See Getchell v. Auto Bar Systems Northwest, Inc., supra.*

Defendant next argues that the articles were substantially true and that it has established the defense of truth as a matter of law. The allusion to "right-wing causes and candidates" is justified by defendant on the basis that some

function of determining whether the articles, if defamatory, were libelous per se:

If you find that the articles in question were libelous as I have defined that term for you, you shall further consider whether or not they were libelous *per se*. In law, any publication which tends to

1. Expose a living person to hatred, contempt, ridicule or obloquoy or deprive him of the benefit of public confidence or social intercourse, or

2. Injure him in his business, occupation, profession or office is libelous *per se*.

If your verdict in this case is for the plaintiff and if you decide that the articles were libelous *per se* as I have herein instructed you, I further instruct you that in fixing damages it is not necessary that the plaintiff produce evidence of actual or special damages but that he is entitled to an award of damages because the law presumes that damages flow from a libel *per se*. On the other hand, if your verdict is for the plaintiff but you find that the articles were not libelous *per se,* your award should reflect your finding as to the actual and special damages sustained by the plaintiff.

[4]Restatement of Torts § 614 (1938), sets forth the respective functions of judge and jury in these matters:

(1) The court determines whether a communication is capable of a defamatory meaning.

(2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient.

In *Amsbury v. Cowles Publishing Co.,* 76 Wn.2d 733, 458 P.2d 882 (1969), we adopted the Restatement position and held it applicable, in all but extreme cases, to the additional issue of whether a defamatory article is also libelous per se, thus precluding the need to prove special damages.

of plaintiff's clients classified themselves as "conservative democrats" or as otherwise "conservative," and on defendant's assertion that the terms "conservative" and "right wing" are synonymous. Beyond this, defendant makes no attempt to justify many statements which are capable of being viewed as having defamatory meaning and content: *e.g.,* the statements that plaintiff's "specialty . . . has been losing right-wing causes and candidates," and that an ad campaign was "inspired by a flour product's success and us[ed] the same technique," that plaintiff's type of work best succeeds in an atmosphere where the public is "bored," that his work employs a "covert" "bag of tricks," "lavishly financed," and finally that plaintiff was "crying all the way to the bank."

The validity of these statements was strenuously contested at trial. The record contains substantial countervailing evidence from which the jury could have found, and obviously did, that the articles in question were not even substantially true. The record shows that plaintiff's partisan political clientele constituted only about one-fourth of his business volume, that a major portion of the political work consisted of school funding campaigns, that his clientele in partisan political campaigns represented many hues of the political spectrum, and that the quality of his efforts in political campaigns was well regarded by others involved in the process who could hardly be labeled "right wing." In the face of such evidence, defendant's contention that it had, as a matter of law, established the substantial truth of the articles is not well taken. *See Jolly v. Fossum,* 59 Wn.2d 20, 365 P.2d 780 (1961); *Spangler v. Glover,* 50 Wn.2d 473, 313 P.2d 354 (1957).

Defendant suggests the instructions were inadequate in failing to place the term "substantial" before the word "truth" in each instance. The court's instruction as to the defense of truth explicitly states that the jury is to find for defendant if it finds that the statements and inferences in the articles were substantially true. The instruction clearly permitted defendant to argue its theory of this de-

fense to the jury. In fact, defendant did just that, pointing out to the jury that the court's instruction only required a finding of substantial truth. Thus, although it would have been preferable to be more explicit, the failure to qualify the word "truth" each time it appears in the instruction was not error. *Hartman v. Port of Seattle,* 63 Wn.2d 879, 389 P.2d 669 (1964).

■ Defendant also contends that it has established the traditional common law defense of fair comment as a matter of law. This contention is advanced with the claim that the articles were substantially true as a matter of law. As we have noted, that claim is not supported by the record. Since a comment cannot be "fair," in the common law sense, if based upon a false statement of fact, defendant's contention on this point fails. *See Cohen v. Cowles Publishing Co.,* 45 Wn.2d 262, 273 P.2d 893 (1954).

Defendant attacks the trial court's instruction on fair comment and assigns error to the rejection of its proposed instruction. We have reviewed both instructions, and conclude that the instruction given adequately states the law and presents defendant's theory on the issue. *E.g., see, Samuelson v. Freeman,* 75 Wn.2d 894, 454 P.2d 406 (1969); *Rickert v. Geppert,* 72 Wn.2d 1040, 432 P.2d 645 (1967).

■ Defendant asserts that certain collateral evidence was erroneously excluded at trial. Since defendant made no offer of proof, the record contains nothing from which we can determine the merit of this contention and we will not further consider it. *E.g., Mason v. Bon Marche Corp.,* 64 Wn.2d 177, 390 P.2d 997 (1964).

Having reviewed the record in light of defendant's assertion of traditional common law defenses, we proceed to the principal thrust of the defense—the claim that defendant is protected from the consequences of any defamation in these articles by reason of *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), and its progeny. The rule stated in *New York Times* at 279 is:

The constitutional guarantees [of freedom of speech and press] require, we think, a federal rule that prohibits

a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" —that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

This rule was subsequently extended to cover "public figures" seeking recovery for defamatory falsehoods relating to their public conduct. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967); *Associated Press v. Walker,* 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967). We have recognized and applied the *New York Times* rule on three prior occasions, each of which involved an assertion that the plaintiff was a "public figure." *Tilton v. Cowles Publishing Co.,* 76 Wn.2d 707, 459 P.2d 8 (1969); *Amsbury v. Cowles Publishing Co.,* 76 Wn.2d 733, 458 P.2d 882 (1969); *Grayson v. Curtis Publishing Co.,* 72 Wn.2d 999, 436 P.2d 756 (1967).

These precedents establish three requisites to constitutional shelter against liability for defamatory falsehoods in "public figure" cases: (1) The plaintiff must be a "public figure" within the contemplation of the Supreme Court precedents; (2) The defamatory falsehoods must pertain to that which makes the plaintiff a "public figure"; (3) The statements must have been published without "actual malice," in the constitutional sense of that term. However, as we shall discuss, these factors have been altered by *Rosenbloom v. Metromedia, Inc., supra.*

The trial court submitted to the jury the "public figure" and "actual malice" issues of *New York Times, Inc. v. Sullivan, supra.* Under the instructions, the jury was permitted to render a verdict for the plaintiff if it found defamatory falsehood and that either (1) plaintiff was not a public figure and the articles were either not substantially true or did not constitute fair comment; or (2) plaintiff was a public figure, but that the articles were published with actual malice. As only a general verdict was returned, we cannot ascertain which of these bases was used by the jury in reaching its verdict.

■ In *Rosenbloom,*[5] a majority of the Supreme Court has, in effect, abolished the "public official" — "public figure" test of *New York Times, Inc. v. Sullivan, supra; Curtis Publishing Co. v. Butts, supra;* and *Associated Press v. Walker, supra.* Although the lead opinion in *Rosenbloom* is signed by only three Justices, it is observed by Justice White in his concurring opinion that two additional Justices would go even further than does the lead opinion in protecting the news media from damage actions for their defamatory falsehoods. Thus, we may look to the expressions in the lead opinion as constituting the principles to which we should adhere.

The *Rosenbloom* court, after discussion of the constitutional issues and prior holdings in *New York Times* and its progeny, stated:

It is clear that there has emerged from our cases decided since *New York Times* the concept that the First Amendment's impact upon state libel laws derives not so much from whether the plaintiff is a "public official," "public figure," or "private individual," as it derives from the question whether the allegedly defamatory publication concerns a matter of public or general interest. See T. Emerson, The System of Freedom of Expression 531-532, 540 (1970). In that circumstance we think the time has come forthrightly to announce that the determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern, albeit leaving the delineation of the reach of that term to future cases.

403 U.S. at 44.

The basic shift from the "public figure" concept of prior cases is illustrated by the observation in the lead opinion of *Rosenbloom:*

If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private

[5]*Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971), was decided after the trial and oral argument of this case. Obviously, the trial court did not have the opportunity, when formulating its instructions and when ruling on trial motions, to know of the change the Supreme Court was to make in rendering the *Rosenbloom* decision.

individual is involved, or because in some sense the individual did not "voluntarily" choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety.

403 U.S. at 43.

In the case at bar, as previously discussed, the jury determined that the publications were in fact defamatory and devoid of substantial truth. The jury was properly instructed as to these elements, and the record contains ample evidence in support of its conclusions. But plaintiff's plea for redress must also pass scrutiny in light of the free press guaranty of the First Amendment. The constitution does not cloak defamatory falsehood with respectability. Rather, the constitution requires that some flagrant abuse be tolerated in order to assure a vibrant free press. As observed early in our history and reiterated in *Rosenbloom:*

> " 'Among those principles deemed sacred in America, among those sacred rights considered as forming the bulwark of their liberty, which the Government contemplates with awful reverence and would approach only with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind than the liberty of the press. That this *liberty* is often carried to excess; that it has sometimes degenerated into *licentiousness*, is seen and lamented, *but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good with which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn. However desirable those measures might be which might correct without enslaving the press, they have never yet been devised in America.'* " 6 Writings of James Madison, 1790-1802, p. 336 (G. Hunt ed. 1906) (quoting a memorial to a French minister) (emphasis in original).

403 U.S. at 51.

The disastrous effect of heavy damage judgments in libel actions, both as a financial reality and as a prospect induc-

ing "self-censorship," is regarded as a dangerous constriction on the robust exercise of a free press. *See Time, Inc. v. Hill*, 385 U.S. 374, 17 L. Ed. 2d 456, 87 S. Ct. 534 (1967).

The focus of *New York Times* through *Rosenbloom* has been upon the balance (or "tension") between the individual's financial interest in his reputation and the constitutional guaranties of free press. *See Rosenblatt v. Baer*, 383 U.S. 75, 86, 15 L. Ed. 2d 597, 86 S. Ct. 669 (1966). It is now clear that these cases hold the interests of the press weigh much more heavily in this balance. A plaintiff's judgment for libel damages against the news media

> for a defamatory falsehood . . . relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not.

*Rosenbloom*, 403 U.S. at 52.

■ Here, the defamatory falsehoods in defendant's articles pertained to plaintiff's involvement in political campaigns, the methods used and the results. It cannot be gainsaid that the conduct of a campaign, be it for a public office or for special tax millage, is a matter of public interest and concern. In our system of government, the ways and means used by those seeking public office and in "selling" the public a tax spending program are sometimes a greater matter of public concern than is the result of the campaign itself. We can hardly ignore the current public scrutiny of campaign practices, campaign contributions, and campaign expenditures. To say that these publications by defendant did not deal with plaintiff's involvement in matters of public concern would be something less than realistic.

■■ It follows that plaintiff must demonstrate knowing or reckless falsity with clear and convincing proof if he is to succeed in this action. The record is devoid of any evidence that defendant published the articles with actual knowledge of falsity. As to reckless disregard, the

> "cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have pub-

lished, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S., at 731.

*Rosenbloom*, 403 U.S. at 56.

Defendant contends that the issue should not have been submitted to the jury at all in that plaintiff failed, as a matter of law, to sustain his burden of proof. The constitutional requirement of clear and convincing proof does not demand *conclusive* evidence of knowing or reckless falsity. To so read *Rosenbloom* and the other *New York Times* cases is to put plaintiff in an all-or-nothing position on the issue, excluding juries altogether. Such would be contrary to the recognition in those cases of a potential jury function on the question. We think the more accurate interpretation is that as to the question of knowing or reckless falsity, "as is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show" knowing or reckless falsity. *See Rosenblatt v. Baer, supra,* at 88. This court has set forth a similar rule in analogous cases of privilege. *E.g., Ward v. Painters' Local Union 300,* 41 Wn.2d 859, 252 P.2d 253 (1953).

We adhere to these statements. However, that rule does not yield the conclusion that issues within its cognizance are, in all instances, questions of law for the court. Reference to Restatement of Torts § 619, cited in *Rosenblatt v. Baer, supra,* and also cited by this court in *Ward v. Painters' Local Union 300, supra,* clarifies the meaning of the use of the phrase "in the first instance." The Restatement comment notes:

If the facts are in dispute, the jury is called upon to consider the evidence and pass upon the issues thus raised. It is for the court, however, to decide whether the facts found by the jury made the occasion privileged or to instruct the jury as to what facts they must find in order to hold the occasion privileged.

Restatement of Torts § 619, comment at 310. *See also,* Comment, Wash. L. Rev. 36, 47-48 (1955); Annot., *Relative provinces of court and jury as to privileged occasion and privileged communication in law of libel and slander,* 26 A.L.R. 830 (1923).

In actions seeking damages from news media for defamatory falsehoods relating to plaintiff's involvement in an event of public or general concern, it is incumbent upon trial courts in the first instance to determine whether the evidence is of sufficient probative quality that the jury could reasonably find therein clear and convincing proof of knowing falsity or reckless disregard as to truth or falsity and, if so, to instruct the jury that it must find for defendant on the issue unless it determines that defendant knew the material was false or in fact entertained serious doubts as to the truth of the publication. *See Rosenbloom v. Metromedia, Inc., supra.*

In ascertaining whether the constitutional standard of proof of knowing or reckless falsity has been met, we are obliged to review the record de novo. *Rosenbloom* (403 U.S. at 54), and cases there cited. While it is necessary to review factual circumstances on a case-by-case basis, it is instructive to compare the stated facts found insufficient in *Rosenbloom* with those of the instant case.

*Rosenbloom* involved two series of broadcast publications. The first dealt with the plaintiff's involvement in a series of police raids on outlets of allegedly obscene books and magazines. The contents of these broadcasts were based on information supplied by the police commander in charge of these raids, and he testified that the broadcasts accurately reported his information. Of eight broadcasts over a period of 14 hours, two neglected to use the words "reportedly" or "allegedly" before the term "obscene books" in the middle of the broadcast text. Elsewhere in their brief text, the two broadcasts reported that police confiscated "allegedly obscene books" and arrested plaintiff "on charges of possession of obscene literature." The second series of broadcasts pertained to an action by Rosenbloom

and others for an injunction against public officials. The broadcasts did not name Rosenbloom, but characterized the injunction sought as one "ordering them to lay off the smut literature racket," and to plaintiffs generally as "the girlie-book peddlers." The final broadcast of this series occurred after Rosenbloom, by telephone, complained of the accuracy of the broadcasts to a part-time newsman. Rosenbloom made no request for retraction or correction. Following this complaint, defendant checked the accuracy of its report with the federal judge presiding in the case. Rosenbloom's attorney conceded the accuracy of the subsequent broadcast. Through all of these publications, defendant was operating under 30-minute deadlines and was dealing with what the Supreme Court termed "hot news." Reviewing these circumstances, the Supreme Court concluded:

> While we may assume that the District Court correctly held to be defamatory respondent's characterizations of petitioner's business as "the smut literature racket," and of those engaged in it as "girlie-book peddlers," there is no evidence in the record to support a conclusion that respondent "in fact entertained serious doubts as to the truth" of its reports.

*Rosenbloom,* 403 U.S. at 56.

There can be little cavil with this conclusion. Each of the broadcasts dealt with "hot news"—events in process and of immediate public concern. The publisher was acting within exceedingly limited deadlines. Other circumstances gave no indication that the publisher had reason to doubt the truth of the broadcasts. Its information was received directly from the police officer in command of the raids, public records, the district attorney's office and a presiding federal judge—the very places from which corroboration would have been obtained had the material come from an intermediate source. Plaintiff's strongest evidence that the publisher might have reason to doubt the veracity of its broadcasts was his telephone complaint to a part-time newscaster of defendant, but that was weak and innocuous evidence on the issue. The protest merely stated disagreement with the legal designation of the materials seized; there was no re-

quest for retraction or correction. Such a complaint would be as consistent with fear that truth be known as with indignation that a lie has been published. Nothing in these circumstances supports a reasonable inference or conclusion that the publisher had ignored indicia of falsity in its reports.

The case at bar involves different circumstances. Here the articles in question, though involving matters of continuing public concern, did not deal with "hot news." The campaign activities discussed were past history and there was no campaign in process. The publisher's deadlines were on a weekly, rather than half-hourly, basis. The publications were unsolicited articles, submitted by a freelance writer. Their author was an active political opponent of candidates and causes employing plaintiff, and specifically of opposition candidates in the elections to which the first article mainly referred. It is a reasonable inference, from the fact of their years of personal and professional acquaintance, that the publisher knew of the author's political predisposition. Despite these circumstances, and the contumelious tenor of the articles, the publisher made no attempt whatever to corroborate statements and implications therein. The thought that this failure might, in itself, indicate the publisher's belief in the truth of the material is countered by the evidence that defendant itself had actively supported, in the preceding elections and at other times, candidates and causes directly opposed to those employing plaintiff. This evidence is pertinent, not because it demonstrates personal malice or ill will, but because it indicates an atmosphere infected with a disposition to ignore known falsehoods or serious doubts as to the truth of that which is published.

Here, unlike the situation in *Rosenbloom*, plaintiff went directly to the publisher, complained about the validity of the November article and specifically asked him "to refrain from further libeling me." A few weeks later the February article was published. It purportedly was based upon statements in *Helix*, a tabloid which the publisher testified he

then considered to be an "underground" "hippie" magazine, "emphasizing sex and marijuana." Again the article did not concern "hot news," the references to plaintiff were transparently disparaging, and no effort was made to corroborate the story even by comparing it with its purported source. In fact, the *Helix* article nowhere states that plaintiff's "specialty heretofore has been losing right-wing causes and candidates." That defamatory falsehood was gratuitously added by the *Argus* writer.

In *Curtis Publishing Co. v. Butts, supra,* a majority of the Supreme Court indicated that there was ample evidence of "actual malice" where the publisher had embarked on a policy of "sophisticated muckraking," had not checked the sources of its informer, and had made no further efforts at investigation upon being notified by the plaintiff that the material to be published was false. We think the circumstances surrounding the *Argus* articles provide proof as substantial on this issue as that considered sufficient in *Butts.*

The jury could reasonably have found in this evidence an objective manifestation that defendant in fact entertained serious doubts as to the truth of the defamatory statements in the subject articles. *See Curtis Publishing Co. v. Butts, supra.* To require more direct proof, in the name of "convincing clarity," would be to effectively deny redress to all plaintiffs who cannot marshal admissions from their defamers. We do not believe that such a result is required or contemplated in the precedents of the United States Supreme Court. *See Keogh v. Pearson,* 244 F. Supp. 482 (D.D.C. 1965), *reversed on other grounds; Washington Post Co. v. Keogh,* 365 F.2d 965 (D.C. Cir. 1966), *cert. denied,* 385 U.S. 1011. Nor are we inclined to read so stringent a requirement "between the lines" of *Rosenbloom* and other Supreme Court opinions subsequent to *Butts.* Our hesitance is partly based upon recognition that the legitimate interest of an individual in his reputation is not and should not be totally eclipsed by news media claims under

the free press guaranty.[6] *Tilton v. Cowles Publishing Co.,* 76 Wn.2d 707, 459 P.2d 8 (1969). *See Rosenbloom,* 403 U.S. at 44, 45, n.12 and 13.

Furthermore, it seems to us that there comes a point beyond which the sheltering of the media from the consequences of its defamation of a person can have a deleterious effect on other vital First Amendment freedoms of individuals, *e.g.,* free speech, assemblage and petition for redress of grievances. Especially is this true as to the exercise of these rights by those who have not become generally and publicly identified with the issue or do not otherwise enjoy access to mass communication media.

If we were to adopt defendant's suggested requirement as to the quantum and quality of evidence necessary to show "actual malice" with "convincing clarity," we would create a situation in which the ordinary individual, considering the consequences, could well be intimidated from the exercise of his personal First Amendment rights. Precedent requires no such rule in the name of free press, and reason militates against it. We conclude that plaintiff's evidence was sufficient to permit the conclusion that defendant in fact entertained serious doubts as to the truth of its publication. Direct proof of defendant's subjective mental attitude at the time of publication is not required. *Rosenbloom,* 403 U.S. at 52 n.18.

In the case at bar the trial court instructed the jury that plaintiff, if found to be a "public figure," could not recover unless he established that the defamatory falsehoods were published with "actual malice." The court instructed the jury as to the constitutional meaning of "ac-

[6]This consideration, as it pertained to the "public official" and "public figure" requirements of prior cases, was recognized in *Rosenbloom,* but was met with the observation that "such matters seem too insubstantial a reed on which to rest a constitutional distinction." Rather, stated that opinion:

If the States fear that private citizens will not be able to respond adequately to publicity involving them, the solution lies in the direction of ensuring their ability to respond, rather than in stifling public discussion of matters of public concern.

*Rosenbloom,* 403 U.S. at 47. The court noted (n.15) that "right of reply" and "retraction" statutes have been passed by some states.

tual malice" and further instructed that plaintiff's burden was to prove its presence with convincing clarity. Defendant takes issue with these portions of the trial court's instructions and with the court's failure to give its proposed instructions on the issue. The instructions given adequately conveyed defendant's theory to the jury.[7] On the other hand, defendant's proposed instructions, requiring proof of "a lie or calculated falsehood knowingly and deliberately published," would have misstated the law and deprived plaintiff of the "reckless disregard" element. An instruction is properly rejected if it is erroneous in any respect. *Vogel v. Alaska S.S. Co.,* 69 Wn.2d 497, 419 P.2d 141 (1966).

Even though plaintiff's evidence of knowing or reckless falsity was sufficient for submission to the jury and the instructions on the issue were adequate, we are unable to affirm the judgment. As a general verdict was returned, we cannot ascertain whether the jury found "actual malice" after a finding that plaintiff was a public figure (public interest in the events reported in the articles), which would be a permissible basis for recovery, or found that plaintiff was not a public figure and based its verdict on failure of the defendant to convince that the publication was protected by the defenses of fair comment or substantial truth. The latter disposition would not be permissible in light of our determination that the defendant is entitled to the First Amendment protection.

 When "it is impossible to know, in view of the general verdict returned" whether the jury imposed liability on a permissible or an impermissible ground, "the judgment must be reversed and the case remanded." *Greenbelt*

---

[7] The instruction defined "actual malice" for the jury in terms of knowing or reckless falsity, as suggested by *Rosenbloom*. Future instructions might well delete reference to malice to avoid possible confusion in the minds of the jury, thereby imposing on plaintiff the burden of showing ill will or motive. The *New York Times* standard "requires only that the plaintiff prove knowing or reckless falsity". *Rosenbloom,* 403 U.S. at 52 n.18.

*Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 26 L. Ed. 2d 6, 90 S. Ct. 1537 (1970).

Reversed and remanded.

HAMILTON, C.J., FINLEY, ROSELLINI, HUNTER, STAFFORD, and WRIGHT, JJ., concur.

HALE, J., concurs in the result.