[No. 766-3.    Division Three.    February 27, 1974.]

Ross Mellor et al., *Appellants*, v. Scott Publishing Co., Inc., *Respondent*.

*Dwight A. Halstead,* for appellants.

*Daniel J. Riviera* (of *Ashley, Foster, Pepper & Riviera*), for respondent.

Green, C.J.—Plaintiffs, Ross Mellor and wife, brought this libel action against the defendant, Scott Publishing Co., Inc., owner and publisher of a daily newspaper known as the Tri-City Herald. Plaintiffs appeal from an order granting defendant's motion for a summary judgment of dismissal.

On December 30, 1969, Ross Mellor contracted with the Board of Commissioners of Franklin County to appraise certain irrigated farmland. The purpose of the appraisal

contract, funded in part by the State of Washington, was to revalue the real property in Franklin County for ad valorem purposes as required by RCW 84.41.[1]

The appraisals prepared by Mellor under the contract reflected market values greater than those previously used by the county in the assessment of property taxes. This increase in market value and an increase in the percentage of assessed value to market value combined to produce higher assessed values and higher property taxes. The prospect of significant property tax increases raised the ire of farmers in Franklin County to the extent that they organized a tax protest group and held public meetings. Numerous farmers filed protests with the Board of Equalization of Franklin County questioning the market values placed on their property by Mr. Mellor.

The Tri-City Herald first reported the controversy on August 6, 1970. Between July 7, 1971, and December 9, 1971, it published a series of 19 articles covering the robust public debate over prospective tax increases that ensued between the protesting taxpayers, the county commissioners, the county assessor and officials of the Department of Revenue. The issues even drew comment from the Governor of the state. The vortex of the debate drew in Mel-

---

[1]The policy of RCW 84.41 was declared as follows:

"84.41.010 Declaration of policy. Recent comprehensive studies by the legislative council have disclosed gross inequality and nonuniformity in valuation of real property for tax purposes throughout the state. Serious nonuniformity in valuations exists both between similar property within the various taxing districts and between general levels of valuation of the various counties. Such nonuniformity results in inequality in taxation contrary to standards of fairness and uniformity required and established by the Constitution and is of such flagrant and widespread occurrence as to constitute a grave emergency adversely affecting state and local government and the welfare of all the people.

"Traditional public policy of the state has vested large measure of control in matters of property valuation in county government, and the state hereby declares its purpose to continue such policy. However, present statutes and practices thereunder have failed to achieve the measure of uniformity required by the Constitution; the resultant widespread inequality and nonuniformity in valuation of property can and should no longer be tolerated. It thus becomes necessary to require general revaluation of property throughout the state."

lor's appraisal. The alleged libelous statements complained of by the plaintiffs were interspersed among the series of articles[2] covering what was clearly a matter of public inter-

[2]The articles containing the alleged libel are set forth, in pertinent part, below. The portions that plaintiffs contend were libelous are set forth in italics. In order to conserve space, the entire articles have not been reproduced.

August 6, 1970:

"*In Franklin County taxpayers are flocking to the board of equalization in record numbers to protest their property values.*

"Some 115 have made the trip.

"Yet in Benton County, which is three times the size, they've had no more than six.

"Likely to be the cause is the fact the state, pressing counties to equalize their assessments at 50 per cent of market value, claims that Franklin County is assessing at 46 per cent.

"Benton County is at only 38.4 while Yakima County, which yearly has only a handful of taxpayers protest its assessments, is at only 30.4.

"Benton and Yakima county residents may realize they're on a good thing—a premise strengthened by the fact that state figures show a Franklin County resident who owns a $20,000 home pays $323.96 in taxes.

"In Benton County he would pay $281.94 and in Yakima County only $212.56.

"On a per-capita basis, Franklin County collects in property tax the 11th highest amount of the state's 39 counties. It totals $169.03.

"Benton County ranks 37th with $97.10 and Yakima County 38th with only $87.82.

"The relative tranquility of board of equalization hearings in Benton and Yakima county may well be due to the fact those residents don't want to rock the boat." (Italics ours.)

July 7, 1971:

"*A wet and rocky farm unit which the federal Land Bank 'wouldn't give a penny on' was appraised at $51,000, said Eldon Jenks, Block 12.*" (Italics ours.)

On July 11, 1971:

"Tuesday was Wilma Van Buren's 47th birthday.

". . .

"Instead of cake and congratulations, the Franklin County assessor received threats of law suits and promises of opposition the next time she seeks re-election.

"Her revelation that the county performed what could be an illegal tax maneuver to favor farmers may spark an uprising among the not-so-favored non-farmers.

"Mrs. Van Buren was doing her 'celebrating' before an audience of irate, tax-protesting farmers from the Columbia Basin project.

". . .

est, concern and controversy.

■ Assuming arguendo that the publications were li-

"Exerting the pressure were farmers, many of whose land assessment had been doubled. It means a doubling of taxes.

"After wallowing in a comfortable lukewarm pool of subsidized existence for years, they'd been plunged into the ice-cold shower by Ross Mellor, an appraiser hired by the county and paid by the state to get property up to what the law defines as 'true and fair value.'

"Ted Cady, administrative assistant in the Department of Revenue, Olympia, explains that the courts and the state attorney general have interpreted this to mean market value, and further have defined it as the price a buyer willing but not obligated to buy would pay a seller willing but not obligated to sell.

"That's been the law for years. In the Basin, Franklin County has ignored with the state's knowledge. It used to be that the Franklin County assessor had a graduated scale, with the land in any irrigation block taxed on a scale which increased gradually through each year of development, supposedly to market value.

"It violated the state law. A couple of years ago the state said the practice must end, so the assessor set a fixed dollar value on each class of land.

"It still didn't comply with the state law, for the land value, while higher than previously, still wasn't at market value.

"*Mellor tried to drop the farmers in the ice bucket.*

"But even then county officials eased the farmers' way into the cold world of reality.

"When Mellor brought his new Basin valuations into the courthouse, officials almost had a fit. They knew what the reaction would be from Basin farmers.

"So the assessor and the commissioners huddled and arbitrarily sliced 30 per cent off Mellor's per-acre valuations.

"Mrs. Van Buren knew she had no authority to do it. However, if she didn't go along she knew that the commissioners, sitting later as a board of equalization, probably would chop the assessments in any case. That meant double work for her overworked office.

"Cady, . . . county commissioners . . . even as a board of equalization have no authority to make blanket cuts.

"      .   .   .

"The state has demanded an explanation from Mrs. Van Buren, in writing.

"*The state is waiting for the explanation before deciding what to do, said Cady. The county received $74,705 of state money to hire Mellor to help get the county up to market value. If the state determines the commissioners thwarted the reason for the grant, it might ask for its money back.*

"      .   .   .

"With the state committed to equalizing tax collections from throughout the 39 counties and stop the old practice of some counties in

belous, an issue we do not decide, plaintiffs' plea for redress must survive the free press and free speech protections

essence paying less than others to support government, Franklin County's action might be seen as a dangerous precedent.

"*The commissioners defend their position.*

"*They claim that last year land which Mellor assessed at $2,000 was selling at $1,500. 'To me last year the appraiser proved he could be wrong,' said Jim Rogers, chairman of the county commissioners.*

"*'We paid for a windshield assessment, and that's what we got.'*"

"*Rogers tells the story of a farmer who claims he repeatedly drove past a man sitting in a car. After an hour, thinking he might need help, he stopped. When asked if he was ok, the man is said to have replied, 'No, I'm appraising your farm.'*"

"*Asked Rogers, 'Wouldn't you call that a windshield appraisal?'*
". . .

"Mellor, a licensed appraiser since 1955, defended his appraisals. He said that to determine what land in the Basin is selling for (which is the figure the state wants) he had examined 'well over 200' sales contracts since 1965. 'It was an appraiser's dream,' he said.
". . .

"Was it a windshield appraisal the county got for its contract price of $25 a parcel? Replied Mellor, 'We looked at every farm twice, and tried to talk to every farmer.'

"Mrs. Van Buren agrees. She approved the 30 per cent cut, not to check on Mellor, but to take farmers through the increase in two easy stages.

"'Ross Mellor is a Master Institute Appraiser,'" said Mrs. Van Buren. "'That's the cream of the crop.'" (Italics ours.)

On July 19, 1971:

"*Franklin County commissioners are 'seriously considering' hiring a rural appraiser for the county assessor's staff to reappraise land where commissioners feel inequities exist.*

"*The commissioners, acting as a County Board of Equalization, have been flooded with protest petitions from taxpayers, mostly farmers, who feel their land was appraised too high.*

"*'The majority of petitioners have got a legitimate gripe,'*" said commissioner Jack Williams.

"*'A lot of the land was valued way too high,'*" said Williams.

"The County Board of Equalization has heard 55 complaints to date. A late surge in protest petitions shows an estimated 250 petitions were submitted by 200 taxpayers before last Thursday's deadline.

"This is a record, commissioners said.

"*Williams said he expects the tax board to make further per acre cuts on the appraised value of some farm land. This would be in addition to the 30 per cent slice off per acre valuations by the assessor's office. The valuations were made by Ross Mellor, an appraiser hired by the county and paid by the state to appraise property at 'true and fair value.'*

afforded to the defendant by the first amendment to the United States Constitution. These protections were summa-

" 'We have heard enough complaints to where we can pinpoint areas we feel might be out of line,' said Commission Chairman Jim Rogers.

"Commissioners hope to tour areas in question either this afternoon or tomorrow before making final decisions.

"Williams said one farmer has been trying to sell his land for $60,000 for more than a year. Yet Mellor valued the land at $85,000.00.

" 'You can't do a windshield appraisal,' said Williams.

"Williams said the tax board has asked each farmer whether he talked to Mellor when he was making the appraisal. Most answered no, he said.

". . .

"Commissioner Bruce Whitemarsh said Mellor put a value of $700 an acre on land in Block 18. Some of the land includes the best soil conditions in the county. Yet other parts of the land is [sic] rocky and situated [on] a hillside. This was valued the same as the good land, said Whitemarsh.

"The tax board already has taken some land that can't be farmed off the tax roles. The land has drainage problems and won't be farmable unless the water level is reduced.

"Williams said it is difficult to make a good appraisal for a contract price of $25.00 per parcel. This was Mellor's fee. It is difficult because of the variety of soil conditions in the county, said Williams." (Italics ours.)

On July 20, 1971:

"After touring six farm blocks Monday a Franklin County commissioner said many petitioners protesting their property valuations have legitimate gripes.

"Commissioners toured block areas to consider farmers protests who say their land was appraised too high.

"Some additional cuts, besides the 30 per cent cut implemented will be made on an individual basis, Bruce Whitemarsh said.

". . .

"Whitemarsh said most reductions probably will be small ones.

"The commissioners are considering hiring a rural appraiser for the county assessor's staff to reappraise land where commissioners feel inequities exist.

"The County Board of Equalization has 250 protest petitions to consider." (Italics ours.)

On August 13, 1971:

"A state official charges that an illegal across-the-board reduction in assessed . . . values to Columbia Basin Project farmers in Franklin County prevented a legal reduction to three times as many non-farmers.

". . .

rized in *Miller v. Argus Publishing Co.*, 79 Wn.2d 816, 490 P.2d 101 (1971); and *Chase v. Daily Record, Inc.*, 83 Wn.2d

"Because of the 30-per-cent reduction to Basin farmers, George Kinnear, director of the State Department of Revenue, said:

" 'Franklin County will receive no more state money to help with its reassessment program.'

" *. . .*

*Why didn't the commissioners consult with Mellor prior to cutting his appraisals 30 per cent? 'That's a good question,' said Rogers. 'We were rushed.'*

" *'We didn't think the appraisals were right, and in the testimony we've received since we're sure the cut was in order.'*

"*Asked about the threatened cutoff of state funds for reappraisal work, Rogers said, 'I feel that with the work we got under the state program we don't want any more money. We should do the work with our own people.' "* (Italics ours.)

On August 15, 1971:

"*Franklin County farmers should pay their property taxes 'under protest' and argue the increased assessments before a judge, a protest leader says.*

"*Ken Miller, Block 17 hay farmer who organized a hearing July 6 with county officials and farmers, said a planning meeting will be held this week to advise farmers on fighting the increased taxation.*

" *'The city guys are getting hung—we're getting hung,' Miller said.*

" *'With this 30 per cent cut, it made it look like the county was doing us a favor, but what the county commissioners should have done was get us all a good appraisal.'*

"The news Friday that the 30 per cent blanket tax cut in the appraisals for dryland wheat farmers would prevent a lesser cut for all Franklin County property owners may pit the farmers against the others, Miller said, but all citizens are suffering.

" *'The whole thing should be thrown out and reappraised,' he said, complaining that the county got the cheapest 'windshield appraisal' which didn't accurately reflect land values. Even the appraisals cut 30 per cent are too high, he says.*

"*Miller also said that if a farmer could afford to hire a lawyer and get an independent reappraisal, he could get a large tax cut. In one case, he said, a $180,000 appraisal was cut by a third by the commissioners sitting as a board of equalization."* (Italics ours.)

On August 17, 1971:

"Miller and other farmers say the revaluations—even after the 30 percent cut—were too high and the land wasn't properly appraised."

On August 20, 1971:

" *'We must get the appraisals thrown out,' he* [Ken Miller] *said. 'The block areas have never been appraised right. The first appraisal should have been done right.'*

"*The county received $74,000 in state money for the county to do*

37, 40-41, 515 P.2d 154 (1973). In *Chase,* the court stated:

In reviewing the preceding judgments in this case, we are mindful of the pertinent modification to the law of

*the 'windshield' assessments, he said. 'They could have gotten $150,000.'*
" *'I want my place walked over,' he said.*

"The appraisals were made by Ross Mellor, a contract appraiser. One farmer said that Mrs. Van Buren should have authorized land use and income basis for coming up with an assessment rate.

"Miller said sprinkler systems should be depreciated.

" 'My taxes exceed my income' injected another farmer.

"When Miller meets with Kinnear [Department of Revenue] Monday, he will discuss land classification, land use and depreciating sprinkler systems." (Italics ours.)

On October 15, 1971:

*"Franklin Tax Probe Ordered*

"As a result of protests voiced to him on a trip to the Tri-Cities last month, Gov. Dan Evans has ordered a fact-finding investigation of property tax conditions in Franklin County.

"The governor said today that representatives of agricultural groups will be invited to a meeting Oct. 26 along with local legislators, Franklin County assessor Wilma Van Buren and the local contract appraiser who is responsible for determining new evaluations under the state-funded property evaluation program.

"Evans said this will be the first time the protesting farmers group and other principals have met jointly to discuss tax problems.

"He said comments made to him on his visit to the Tri-Cities last month left him 'deeply concerned.'

"Revenue director George Kinnear will be asked to report directly to the governor with recommendations for actions if it appears the state has legal grounds for interceding, he added.

"Franklin County farmers have protested revaluation of their farm land."

On December 9, 1971:

*"The State has authorized an 'extensive' reappraisal of Franklin County irrigated lands for taxes.*

*"The State will pay for a skilled appraiser to help do the job.*

"This fact was reported today by George Kinnear, Department of Revenue director, after an investigation and review of the controversial revaluation of irrigated farmland in Franklin County.

"A six-page report notes that the state has approved an amended revaluation program for Franklin County 'which adequately and properly maintains the four-year revaluation program as required by statute.'

"Kinnear had announced in Pasco Oct. 26 that Franklin County's schedule of property reappraisal was no longer approved by the state Department of Revenue.

libel established by the United States Supreme Court in *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964), as that relates to "public officials." In delineating the protection accorded speech and press by the First Amendment, the court prefaced its ruling in *New York Times* with the following observation:

> [We] consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. *See Terminiello v. Chicago,* 337 U. S. 1, 4;. *De Jonge v. Oregon,* 299 U. S. 353, 365.

*New York Times Co. v. Sullivan, supra* at 270-71. Upon this basis, the court concluded as follows:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

*New York Times Co. v. Sullivan, supra* at 279-80. Ro-

---

" 'Completion of the 4-year program was completely out of whack' when the county gave 30 per cent assessed valuation cuts for 1,687 parcels revalued this year, Kinnear said today in Pasco.

". . .

"Kinnear said the contract appraiser (Ross Mellor), who was responsible for the valuations of the irrigated land, in classifying farm land as irrigated or non-irrigated land instead of the Bureau of Reclamation land classification, 'was following verbal instructions of the county assessor.'

"After classifying the land as irrigated or non-irrigated, Mellor then looked at comparative sales, said Kinnear.

"The overall quality of Mr. Mellor's appraisals was supported by two sales-appraisal-ratio studies, the first dated September 1970 and the second in June 1971. These show that the relationship of Mellor's appraised values to selling price of lands ranged between 94.2 and 98.18 per cent, the report stated.

". . .

"Kinnear said he doubted there would be much of an overall difference in the valuations using the land classifications." (Italics ours.)

*senbloom v. Metromedia, Inc.,* 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971), expanded the "public official"— "public figure" test of *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964). On this point, the court in *Miller,* at pages 825-27, said:

> The *Rosenbloom* court, after discussion of the constitutional issues and prior holdings in *New York Times* and its progeny, stated:
>
> > It is clear that there has emerged from our cases decided since *New York Times* the concept that the First Amendment's impact upon state libel laws derives not so much from whether the plaintiff is a "public official," "public figure," or "private individual," as it derives from the question whether the allegedly defamatory publication concerns a matter of public or general interest. See T. Emerson, The System of Freedom of Expression 531-532, 540 (1970). In that circumstance *we think the time has come forthrightly to announce that the determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern, albeit leaving the delineation of the reach of that term to future cases.*
>
> 403 U.S. at 44.
>
> . . .
>
> . . . The constitution does not cloak defamatory falsehood with respectability. Rather, the constitution requires that some flagrant abuse be tolerated in order to assure a vibrant free press. As observed early in our history and reiterated *in Rosenbloom:*
>
> > " 'Among those principles deemed sacred in America, among those sacred rights considered as forming the bulwark of their liberty, which the Government contemplates with awful reverence and would approach only with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind than the liberty of the press. That this *liberty* is often carried to excess; that it has sometimes degenerated into *licentiousness,* is seen and lamented, *but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good with*

*which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn. However desirable those measures might be which might correct without enslaving the press, they have never yet been devised in America.'* " 6 Writings of James Madison, 1790-1802, p. 336 (G. Hunt ed. 1906) (quoting a memorial to a French minister) (emphasis in original).
403 U.S. at 51.

The disastrous effect of heavy damage judgments in libel actions, both as a financial reality and as a prospect inducing "self-censorship," is regarded as a dangerous constriction on the robust exercise of a free press. *See Time, Inc. v. Hill*, 385 U.S. 374, 17 L. Ed. 2d 456, 87 S. Ct. 534 (1967).

The focus of *New York Times* through *Rosenbloom* has been upon the balance (or "tension") between the individual's financial interest in his reputation and the constitutional guaranties of free press. *See Rosenblatt v. Baer*, 383 U.S. 75, 86, 15 L. Ed. 2d 597, 86 S. Ct. 669 (1966). It is now clear that these cases hold the interests of the press weigh much more heavily in this balance. A plaintiff's judgment for libel damages against the news media

*for a defamatory falsehood . . . relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not.*

*Rosenbloom*, 403 U.S. at 52.

(Italics ours.)

The trial court, with these principles in mind, determined that even if the alleged statements were libelous, there was "nothing to submit to the jury proving that the defendant acted with knowledge of falsity or with a reckless disregard of whether it was false or not." Having reached that conclusion, the defendant's motion for summary judgment was granted. The correctness of this determination is the sole issue on appeal.

██ The standards applicable to the determination of motions for dismissal in libel cases have been the subject of

judicial discussion. In *Miller,* at pages 827-29, the court said:

> It follows that plaintiff must demonstrate knowing or reckless falsity with clear and convincing proof if he is to succeed in this action. The record is devoid of any evidence that defendant published the articles with actual knowledge of falsity. As to reckless disregard, the
>
> > "cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as *to the truth of his publication.*" *St. Amant v. Thompson,* 390 U.S., at 731 [20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968)].
>
> . . .
>
> . . . The constitutional requirement of clear and convincing proof does not demand *conclusive* evidence of knowing or reckless falsity. To so read *Rosenbloom* and the other *New York Times* cases is to put plaintiff in an all-or-nothing position on the issue, excluding juries altogether. Such would be contrary to the recognition in those cases of a potential jury function on the question. We think the more accurate interpretation is that as to the question of knowing or reckless falsity, "as is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show" knowing or reckless falsity. . . .
>
> . . .
>
> In actions seeking damages from news media for defamatory falsehoods relating to plaintiff's involvement in an event of public or general concern, it is incumbent upon trial courts in the first instance to determine whether the evidence is of sufficient probative quality that the jury could reasonably find therein clear and convincing proof of knowing falsity or reckless disregard as to truth or falsity . . .

(Italics ours.) Most recently in *Chase v. Daily Record, Inc.,* 83 Wn.2d 37, 43, 515 P.2d 154 (1973), the court more specifically recounted these standards with respect to motions for summary judgment in libel cases, as follows:

> As to summary judgment procedure in run-of-the-mill lawsuits, it is well established that the function of the trial court in ruling upon a motion for summary judg-

ment is not to resolve the basic factual issues, with the ultimate finality which is expected and is appropriate at the final or "full-blown" trial stage of a lawsuit. Rather, the trial court's function is to determine whether a genuine issue as to any material fact exists. . . . In defamation actions by public officials, although the summary judgment procedure is basically the same, we are convinced the decisions of the United States Supreme Court have added a new facet, measurement, or dimension which must now be considered and resolved by the trial courts. In other words, in such defamation actions, *if the trial judge at the summary judgment stage determines that the plaintiff has offered evidence of a sufficient quantum to establish a prima facie case, and the offered evidence can be equated with the standard or test of "convincing clarity" prescribed by United States Supreme Court decisions, the motion for summary judgment should be denied.*

(Italics ours.) Viewing the record, in light of these principles, we find that summary judgment was properly granted.

In view of the public controversy that swirled around Mellor's appraisals and the prospective increase in property taxes, it must be concluded that Mellor was clearly involved in an event of public or general concern within the meaning of *Rosenbloom* and its progeny. Thus, the sole issue on appeal is whether the plaintiff offered a sufficient quantum of evidence, equated with the test of "convincing clarity" prescribed by the United States Supreme Court decisions, to establish a prima facie case from which a jury could reasonably find that the defendant published the alleged libelous statements knowing they were false or with a reckless disregard as to whether they were false or not. *Chase v. Daily Record, Inc., supra.* To determine this issue, we are obliged to review the record de novo. *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 54, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971); *Miller v. Argus Publishing Co.,* 79 Wn.2d 816, 829, 490 P.2d 101 (1971).

The alleged libelous statements in this case fall into two general categories: (1) reported statements attributed to

named persons directly relating to the matters in controversy; and (2) descriptive language used by the reporter.

With respect to the reported statements attributed to named persons at public meetings, the record is void of any facts showing the statements were not made or accurately reported. The most that can be said is that plaintiffs disagreed with the opinions expressed by various farmers and commissioners as to the accuracy of the appraisals. This, of course, is inherent in the appraisal of property. It is the stuff out of which condemnation trials are made because expert appraisers often disagree upon value. The contention that defendant should have made a determination as to the correctness of Mellor's appraisals before publishing the opinions of farmers as to land value is to impose an obligation upon the defendant that is reserved to the Board of Equalization and thereafter to the courts.

Plaintiffs argue strenuously that the use of the term "windshield appraisal" in the articles carries the inference that Mellor did a cursory appraisal. Plaintiffs do not contend that the individuals did not refer to the appraisals as "windshield appraisals," but merely contest their correctness. Jack Briggs, Associate Editor, testified that before publishing this characterization of Mellor's appraisal:

> I spent some time trying to find Mr. Mellor if he did a windshield appraisal and as I recall I found him, I think, in Montreal and I think our conversation was long distance on the phone while he was attending, as I recall it, a convention in Montreal. I know I called Montreal. Whether our conversation was there or whether I got him later I don't know, but I talked to Mr. Mellor as far as windshield appraisals were concerned and asked him if he performed a windshield appraisal in Franklin County. . . . His answer to my question was that, "we looked at every farm twice and tried to talk to every farmer", which was the quotation which I used in the column.

These comments were included in the article published on July 11, 1971. In fact, plaintiff admitted in his deposition

that some of the appraisal work was done while sitting in a vehicle:

A  . . .
I am particularly concerned with the statement, "windshield appraising." I don't see why there is any crime in a person sitting in a vehicle doing appraisal work, as it appears to be.

Q  . . . Are you saying, then, that an appraiser who may be making observations of what he is appraising while sitting in a vehicle, is not necessarily doing an inefficient job?

A  That is correct.

Q  And actually, Mr. Mellor, this is not an uncommon way of doing part of one's appraisal duties, is it?

A  That is correct.

Q  . . . You have done this yourself, haven't you?

A  Yes.

Q  And your own Mr. Lowe and Mr. Stone, they have done that also?

A  Yes.

It is not within the province of the defendant to reconcile the conflict of opinion existing between Mellor and others. Defendant's obligation was to report the public controversy fairly and the series of articles contained in the record on appeal does so. The articles disclose that Mellor is an eminently qualified appraiser, that he viewed each property appraised, and the State Department of Revenue recognized that in making the appraisals Mellor followed approved and generally accepted techniques. The Department of Revenue criticized the Board of Equalization for not having plaintiff present at the hearings to support his appraisal figures and answer farmers' questions. It is clear the defendant merely reported the public controversy as it occurred.

We are unable to find any evidence "to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his [its] publication." *Rosenbloom v. Metromedia, Inc., supra.* There is no evidence or inference from the evidence that defendant knew that any of the statements attributed to the named individuals were

false or that the statements were published in reckless disregard as to whether they were false or not. To require before publication an investigation of the accuracy of the statements reported in the instant articles as urged by plaintiffs would stifle the reporting of "hot news" and cripple the operation of the free press in the circumstances of the instant case.

The descriptive language contained in the series of articles to which plaintiffs object is clearly " 'a little touch of [the reporter's] piquant pen.' " *Miller v. News Syndicate Co.*, 445 F.2d 356 (2d Cir. 1971). Read in context, we can find no evidence or inference from evidence that the defendant knew the descriptive language was false or that it was published in reckless disregard as to whether it was false or not.

In conclusion, applying the standard of proof set out in *Chase v. Daily Record, Inc., supra,* we hold that the plaintiffs failed to offer evidence of a sufficient quantum to establish a prima facie case that can be equated with the standard of convincing clarity prescribed by the United States Supreme Court. There was no evidence produced by plaintiffs that would support an issue of material fact on the question of whether the alleged libelous statements were published by the defendant knowing that they were false or with a reckless disregard as to whether they were false or not.

The summary judgment is affirmed.

MUNSON and McINTURFF, JJ., concur.

Petition for rehearing denied April 18, 1974.

Review denied by Supreme Court June 24, 1974.