[No. 381-2.    Division Two.    June 15, 1972.]

ROBERT W. O'BRIEN, *Appellant*, v. THE TRIBUNE PUBLISHING COMPANY et al., *Respondents*.

108

*Argal D. Oberquell* (of *Oberquell & Ahlf*), for appellant.

*Robert Ratcliffe, Patrick C. Comfort* (of *Comfort, Dolack, Hansler & Billett*), and *Valen H. Honeywell* (of *Gordon, Thomas, Honeywell, Malanca, Peterson, O'Hern & Johnson*), for respondents.

ARMSTRONG, J.—This is an appeal from two consolidated libel suits in which summary judgment was granted in favor of the defendants.

■ The appeal centers upon a determination of whether certain alleged defamatory statements made by defendants concerned an event of public or general interest, and if so, whether plaintiff is entitled to a jury trial on the issue of malice. The ultimate question is whether, resolving all factual doubts against the nonmoving party in a summary judgment, a genuine issue of fact survived the pleadings, affidavits, documentary and depositional evidence.

· The plaintiff, Robert W. O'Brien, was the former administrative assistant to Congressman Floyd Hicks, and claims to have been the target of libelous statements published in

The Tacoma News Tribune, Puyallup Valley Tribune and Pierce County Herald at the time of the 1968 political campaign. In that campaign incumbent Congressman Hicks, was opposed by Anthony Chase, one of the defendants. The Tacoma News Tribune publication consisted of a political advertisement over the banner of "Democrats for Chase." This ad contained a copy of an editorial which had appeared in the Pierce County Herald and Puyallup Valley Tribune—both papers operate under a single management and they are, in practical effect, one newspaper. Defendant Franich wrote the editorial. The advertisement is set forth as appendix A and the editorial is set forth as appendix B.

The alleged libelous matter complained of revolves around four major charges made against plaintiff: (1) he received a part-time salary of over $500 per month as a district aide while engaged in other part-time employment, and thereafter received nearly $20,000 per year as a full-time district aide to Congressman Hicks while engaged in campaign work; (2) reference was made to two lawsuits filed against plaintiff which alleged that he falsely represented himself as an attorney, when in fact he was not; (3) O'Brien had sought and obtained a continuance of the lawsuit until after the election to avoid embarrassing his employer—he contends the editorial implies he improperly influenced the court; (4) a letter used in a campaign 2 years before was again used in the editorial and political advertisement—the letter stated that O'Brien threatened a Mrs. Hughes with termination of a government contract because she and her husband removed a Hicks sign from their place of business and replaced it with a sign of Congressman Hicks' opponent.

We find that items 1, 2 and 3 do not present genuine issues of material fact, but we find that the Hughes letter does present a genuine issue of material fact as to whether it is a defamatory falsehood and as to whether the letter was published by the defendants Chase, Turner and The Tribune Publishing Company with "actual malice."

The record shows that O'Brien had worked for Hicks as his administrative assistant, later had worked only part-time as a district aide in Hicks' district, but beginning early in 1968 had become a full-time district aide at an annual salary of between $18,600 and $19,353 per year. During that time he was working in Pierce and Kitsap counties, performing those many functions which a district aide to a congressman is expected to perform, including the maintenance of good public relations with an eye on the coming political campaign. Hicks was challenged by Chase and as a result battle lines were drawn for the political contest. Chase and one of his lieutenants, Richard Turner, also a defendant, were understandably seeking to find any flaw in Hicks' conduct of his political office and they seized upon O'Brien as one of Hicks' weaknesses. On several occasions they talked to defendant Frank Franich who wrote editorials for the Pierce County Herald. Chase gave Franich a brochure on his candidacy and photostatic copies of clippings relating to Congressman Hicks and O'Brien. At a later date Franich wrote an editorial which had Hicks for its principal target, but which, incidentally, discredited O'Brien. Chase and Turner then used this editorial in the political advertisement in The Tacoma News Tribune.

Defendants Turner and Chase denied any malice toward Mr. O'Brien and further denied any malice relating to the accumulation of materials transmitted to defendant Franich or The Tacoma News Tribune. Defendants Franich and The Tribune Publishing Company also specifically denied malice.

Defendants Turner and Chase have stated that they both felt, based upon investigation undertaken, that the content of the information contained in the editorial, and ultimately the political advertisement in its entirety, was true to the best of their knowledge.

On the basis of *New York Times v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964) the trial court concluded that plaintiff occupied a public figure status and that O'Brien had not presented a material issue of "actual malice" which would justify submitting the case to a jury.

The *New York Times* case involved a libel suit by an Alabama public official against The New York Times publishers and several members of civil rights groups for the publishing of an editorial-type advertisement by The Times. The jury awarded plaintiff damages against all the defendants and the judgment on the verdict was affirmed by the Supreme Court of Alabama on the grounds that the statements in the advertisement were libelous per se, false and not privileged, and that the evidence showed malice on the part of the newspaper. The defendants' constitutional objections were rejected by the Alabama court on the ground that the first amendment to the United States Constitution does not protect libelous publications. The decision of the Alabama court was based upon the then existing majority rule relating to libel actions.

The Supreme Court of the United States reversed the Supreme Court of Alabama on the basis that its holding infringed upon the safeguards provided by the First Amendment for freedoms of speech and press, made applicable to the states by the Fourteenth Amendment. In doing so, the court promulgated the now famous *New York Times* rule:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

376 U.S. at 279-80.

In subsequent cases the court expanded the concept of "public officials" to "public figures" in the combined opinion of *Curtis Publishing Co. v. Butts* and *Associated Press v. Walker,* 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967).

The latest expression in the constitutional aspects of the evolving law of libel is contained in *Rosenbloom v. Metromedia,* 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971). This was published after the trial court rendered its opinion in the instant case. In *Miller v. Argus Publishing Co.,*

79 Wn.2d 816, 490 P.2d 101 (1971) the court analyzed the *Rosenbloom* case at it applied to the facts and issues before it. At page 825 the Washington Supreme Court stated:

> In *Rosenbloom,* a majority of the Supreme Court has, in effect, abolished the "public official"—"public figure" test of *New York Times, Inc. v. Sullivan, supra; Curtis Publishing Co. v. Butts, supra;* and *Associated Press v. Walker, supra.* Although the lead opinion in *Rosenbloom* is signed by only three Justices, it is observed by Justice White in his concurring opinion that two additional Justices would go even further than does the lead opinion in protecting the news media from damage actions for their defamatory falsehoods. *Thus, we may look to the expressions in the lead opinion as constituting the principles to which we should adhere.*

(Footnotes omitted. Italics ours.)

After discussing the constitutional issues and prior holdings in *New York Times* and its progeny, the *Rosenbloom* court, 403 U.S. at 44 stated:

> It is clear that there has emerged from our cases decided since *New York Times* the concept that the First Amendment's impact upon state libel laws derives not so much from whether the plaintiff is a "public official," "public figure," or "private individual," as it derives from the question whether the allegedly defamatory publication concerns a matter of public or general interest. See T. Emerson, The System of Freedom of Expression 531-532, 540 (1970). In that circumstance we think the time has come forthrightly to announce that the determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern, albeit leaving the delineation of the reach of that term to future cases.

The shift from the "public figure" concept of prior cases is illustrated by the observation in the lead opinion of *Rosenbloom:*

> If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not "voluntarily" choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content,

effect, and significance of the conduct, not the participant's prior anonymity or notoriety.

(Footnote omitted.)[1] 403 U.S. at 43.

In analyzing the changes in libel law wrought by the recent federal cases the Washington Supreme Court stated at pages 826 and 827 of *Miller v. Argus Publishing Co.,* *supra:*

> The disastrous effect of heavy damage judgments in libel actions, both as a financial reality and as a prospect inducing "self-censorship," is regarded as a dangerous constriction on the robust exercise of a free press. *See* *Time, Inc. v. Hill,* 385 U.S. 374, 17 L. Ed. 2d 456, 87 S. Ct. 534 (1967).
>
> The focus of *New York Times* through *Rosenbloom* has been upon the balance (or "tension") between the individual's financial interest in his reputation and the constitutional guaranties of free press. *See Rosenblatt v. Baer,* 383 U.S. 75, 86, 15 L. Ed. 2d 597, 86 S. Ct. 669 (1966). It is now clear that these cases hold the interests of the press weigh much more heavily in this balance. A plaintiff's judgment for libel damages against the news media
>
>> for a defamatory falsehood . . . relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not.

*Rosenbloom,* 403 U.S. at 52.

Not only does *Rosenbloom* change the test from public figures to matters of public or general concern, it also pre-

---

[1]In a concurring opinion, Mr. Justice White discussed constitutional restrictions on state defamation laws and stated that at least five members of the court would support each of the following rules:

> For public officers and public figures to recover for damage to their reputations for libelous falsehoods, they must prove either knowing or reckless disregard of the truth. All other plaintiffs must prove at least negligent falsehood, but if the publication about them was in an area of legitimate public interest, then they too must prove deliberate or reckless error. In all actions for libel or slander, actual damages must be proved, and awards of punitive damages will be strictly limited.

403 U.S. at 59.

sents a strong mandate to the trial court to carefully re-view the record to ascertain whether there is substantial evidence of "actual malice" as defined in *Rosenbloom* and cases cited therein. The lead opinion held that First Amendment questions of "constitutional fact" compel de novo review by the court.

■ Prior to *Rosenbloom*, the Court of Appeals, in an opinion written by Judge Utter, considered the constitutional limitations on state libel actions in *Tait v. KING Broadcasting Co.*, 1 Wn. App. 250, 460 P.2d 307 (1969). Although the test has now shifted from "public figure" to matters of public or general concern, the analysis of the role of summary judgment in a libel action is clearly stated at pages 254 and 255 of that case:

Is a motion for summary judgment proper to dispose of the issue of "actual malice" in a libel action?

The focus of inquiry is directed to establishing the state of the defendant's mind. This evidence is generally derived from his conduct and other circumstances from which an inference may be drawn that he must have known the statement was either false or was made with a reckless disregard of whether it was false or not.

The determination of "reckless disregard" has been recognized as essentially a factual one to be applied on a "case-by-case" adjudication. *St. Amant v. Thompson*, 390 U.S. 727, 730, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968).

In reflecting on these problems in a libel case, doubt has been expressed whether questions dealing with state of mind should be decided by any other process than a jury determination. *Goldwater v. Ginzburg*, 261 F. Supp. 784, 788 (S.D. N.Y. 1966).

Our court has been conservative in granting summary judgment where the issues involve the inferences to be drawn from admitted facts to determine ultimate facts such as intent, knowledge, good faith and negligence. *Preston v. Duncan*, 55 Wn.2d 678, 681, 349 P.2d 605 (1960). These issues do not normally involve, however, the pursuit of constitutionally protected practices.

Serious problems regarding the exercise of free speech and free press guaranteed by the First Amendment are raised if unwarranted lawsuits are allowed to proceed to trial. The chilling effect of the pendency of such litigation

can itself be sufficient to curtail the exercise of these freedoms. *Dombrowski v. Pfister*, 380 U.S. 479, 14 L. Ed. 2d 22, 85 S. Ct. 1116 (1964), *Time, Inc. v. McLaney*, 406 F. 2d 565, 566 (5th Cir. 1969).

It would seem to us these considerations are of sufficient concern to compel the court to carefully review the record in motions for summary judgment in libel cases involving the exercise of First Amendment guarantees and, at that stage, determine whether there is substantial evidence presented which, if believed, could persuade a jury with convincing clarity the defendant was guilty of maliciously making a libelous statement.

The *Tait* opinion is consistent with *New York Times v. Sullivan, supra,* and *St. Amant v. Thompson,* 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968). With respect to judicial review of facts relating to constitutional standards it anticipated the ruling in *Rosenbloom v. Metromedia, supra.* Because the *Tait* case so clearly analyzes the role of summary judgment on the issue of "actual malice" in a libel action, we adopt the quoted portion as a part of our holding in this case.

██ In motions for summary judgment the moving party has the burden of showing no genuine issue of material fact. Once this has been done by appropriate affidavits and discovery procedures, the other party may not rely upon his pleadings unsupported by evidentiary facts. *W. G. Platts, Inc. v. Platts,* 73 Wn.2d 434, 438 P.2d 867 (1968); *Reed v. Streib,* 65 Wn.2d 700, 399 P.2d 338 (1965).

With this review of the existing law in mind, we turn now to an analysis of the alleged libelous matter contained in the political advertisement set forth as appendix A and the editorial set forth as appendix B. Plaintiff contends that in four separate aspects the editorial and the advertisement presented genuine issues of material fact which should have been presented to a jury for determination. He argues that viewing the evidence in a light most favorable to him he had established actual malice with the convincing clarity which the constitutional standards demand.

We do not agree with plaintiff as to the first three of the contentions, but we do agree that there was a question of

fact on the issue of the Hughes letter as to certain defendants.

O'Brien first contends that actual malice was established in the editorial because it implies that O'Brien received around $20,000 per year while he devoted much, if not most, of his time to campaigning. The editorial states that while on the Hicks' payroll, in the prior year, he had another job "with private industry." The explanation entitled "The Facts", contained in the advertisement in The Tacoma News Tribune, refers to his receiving over $500 per month while he held down a clerk's job.

The O'Brien deposition reveals that he was initially employed as an administrative assistant to Congressman Hicks. He was then transferred to the Tacoma area to serve as a district aide to Congressman Hicks. It was determined, at a later date, that a full time district aide was not needed at that time. It was agreed that O'Brien would work part time for Congressman Hicks as a district aide and he could also work for lawyers as a law clerk and investigator. Viewing the testimony in the light most favorable to O'Brien, we accept his statement that he received $500 per month from the government. He found that his work for lawyers took too much of his time. He was working 7 days a week but the congressman found him frequently unavailable for his work as a district aide. At the beginning of 1968, the election year in question, O'Brien again assumed full-time status as a district aide but he was permitted to complete certain cases he had already started. O'Brien states he received $18,600 per annum that year, but an investigation by the defendants showed that his salary was officially listed as $19,353.56. O'Brien explains this discrepancy by the higher figure being the amount usually paid for his position whereas the lower figure was paid because the congressman made a reduction when he learned of the higher salary.

There is nothing unusual about a district aide working on a part-time or a full-time basis. Neither is it unusual for district aides of congressmen to engage in public relations

work in addition to serving the legitimate requests of constituents at home. When the campaign approaches, a district aide frequently engages in some political activity. The extent of that activity is a legitimate public concern. It is not at all unusual for a political opponent to exploit any weakness he thinks he detects in the incumbent's congressional staff.

While neither the editorial nor the advertisement pointed out the plaintiff's side of the case, we find nothing more than the usual partisan analysis with respect to salary and general employment responsibilities of O'Brien. Considering the evidence in the light most favorable to O'Brien, we find mild exaggeration but we do not find substantial evidence of a defamatory falsehood.

O'Brien next contends that the reference to two damage actions filed against him for allegedly falsely representing himself to be a lawyer was defamatory and demonstrated actual malice. The damage actions were dismissed when they were brought to trial but that had not occurred when the editorial was written and the political advertisement was published. The allegations in the complaint were checked to see that the complaint had been filed against O'Brien.

A newspaper has a qualified or conditional privilege to report legal proceedings provided the publication is a fair and accurate statement of the contents and is made without malice. Despite authority from other jurisdictions holding that the defense of qualified privilege does not attach to pleadings which have been filed in court but upon which no judicial action has been taken, we think the more recent trend of the law is to the contrary. We agree with those decisions which uphold the claim of privilege to report charges made in pleadings on the ground that the filing of a pleading is a public and official act in the course of judicial proceedings. *Campbell v. New York Evening Post*, 245 N.Y. 320, 157 N.E. 153, 52 A.L.R. 1432 (1927); *American Dist. Tel. Co. v. Brink's Inc.*, 380 F.2d 131 (7th Cir. 1967); *Johnson v. Johnson Publishing Co.*, 271 A.2d 696 (D.C. App. 1970).

118

Since the subject matter contained in the publication of the two lawsuits was one of legitimate public concern the defendants were entitled to refer to the lawsuits in the editorial and advertisement unless they were motivated by "actual malice." There was no substantial evidence that defendants knew the statements in the lawsuit were false or that the defendants, on the basis of their knowledge, evidenced a reckless disregard of whether the subject of the lawsuits was false or not. The filing of the lawsuits was investigated by all of the defendants. Both Turner and Chase interviewed the plaintiffs in the lawsuits before publication of the advertisement.

Prior to the publication of the ad O'Brien warned Chase that portions of the ad were false. In his deposition O'Brien stated:

A. I informed him that I knew about this political ad that he was proposing to run; that the statements in there were not true; *that many of them were factual as far as the lawsuits, but I thought that it was dirty politics*; that I informed him that he wasn't going to win the campaign, that he was going to have to answer to this when it was over, if he published it.

We find that although the statements made about the lawsuits were defamatory, the newspaper was accorded a conditional privilege to report the legal proceedings. As O'Brien recognized, the ad was factual to the degree that it accurately related the nature of the lawsuits as described in the news article. Turner and Chase investigated the lawsuits and interviewed the two plaintiffs in the lawsuits against O'Brien. Franich investigated the filing of the lawsuits. There was not substantial evidence of "actual malice" with reference to the statements about the lawsuits. The fact that the trial of the cases ultimately vindicated O'Brien is not material to the determination of the motivations of the defendants before the decision of the trial judge.

In his third point, O'Brien argues that the editorial implies he endeavored to improperly influence the judge who continued his damage case until after the election. There was nothing wrong in O'Brien requesting such a continu-

ance to avoid embarrassment to Congressman Hicks. Nor was there any impropriety in the judge considering such a request in the midst of a heated election campaign. There was nothing defamatory to O'Brien in the reference to the action of the judge.

The fourth point raised by O'Brien challenges the editorial and advertisement reference to the Hughes letter. This related to a letter to the editor of The Argus in a campaign 2 years before the one in question. Since O'Brien asserts that the letter was not published in The Argus, we must accept his version for the purposes of considering the summary judgment. In any event, the letter was published in an advertisement in The Tacoma News Tribune and widely circulated in the prior campaign. As the exhibits set forth in the appendixes show, the letter of Mrs. Hughes was published in the editorial and quoted in the advertisement. In that letter, Mrs. Hughes wrote:

> Mr. Robert O'Brien, who is Mr. Hicks' administrative assistant and is paid by our tax dollars, came into our store with another representative of Mr. Hicks. He proceeded to talk to me in a very rough manner concerning the removal of the Hicks sign. When I explained to him that my husband was at the present time in Washington D.C. on business concerning a government contract we have, he threatened me to this extent: He stated to me that we had a government contract, indicating that ours would be terminated. Also, he said we would be very sorry for the change of signs and that he was going to the nearest phone immediately and phone Washington D.C. and make sure that my husband would be most unwelcome in Hicks' office from this time on.

O'Brien argues that the letter was a defamatory falsehood and libelous per se. He does not deny that the encounter took place but he denies that he talked to Mrs. Hughes in a very rough manner and specifically denies that he threatened her or that Mr. Hughes had a government contract. When she told O'Brien that her husband was in Washington, D.C. with reference to a government contract, he detailed to her the special service that he had performed for Mr. Hughes in connection with his attempts to obtain a

contract. With reference to the replacement of the Hicks sign with a sign of Mr. Hicks' opponent in the 1966 campaign, O'Brien stated:

> I said, "That is pretty shabby treatment. So if Mr. Hughes will not call me, would you please tell him that I am going to relay this episode to our office, and I just don't believe that they are going to be quite as accommodating. He will be received and accorded everything that a constituent has coming to him, no more, no less."

Initially we recognize that the Hughes letter was defamatory. In view of the principle that all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion for summary judgment, we are of the opinion that the letter, read as a whole and given its ordinary meaning, presents a genuine issue of material fact as to whether it is a defamatory *falsehood*.

Since the incident described in the Hughes letter was clearly a matter of public or general concern, we next inquire—was there a genuine issue of material fact as to whether the letter was published by the defendants with "actual malice." To accomplish this, plaintiff must demonstrate by clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not. Reckless disregard is not to be measured by what a reasonably prudent man would have published or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendants entertained serious doubts as to the truth of the publication. *Rosenbloom v. Metromedia, supra; St. Amant v. Thompson, supra; Miller v. Argus Publishing Co., supra.*

O'Brien testified in his deposition that the Hughes letter political ad was published by only one newspaper in 1966 —The Tacoma News Tribune. O'Brien stated that when he saw the 1966 ad he telephoned William G. Robinson, general advertising manager of the newspaper, and advised him that the letter was false in that he had not threatened Mrs. Hughes and Mr. and Mrs. Hughes did not have a

government contract. O'Brien said he told Mr. Robinson he would get an injunction if the paper intended to run the ad again. O'Brien claimed that Robinson left him with the impression that he need not get an injunction. The Tacoma News Tribune did not run the ad again in 1966.

Mr. Robinson did not recall the incident but acknowledged that he was the appropriate person to notify as he was the general advertising manager of the newspaper and he was involved, to a degree, in the handling of the Hughes letter ad in 1966. The ad was referred to The Tribune's legal counsel for approval. Mr. Robinson did not know the details of the investigation of the contents of the ad. It was reported to Robinson, either on the occasion of the publication or subsequently, that there had been a substantially corroborative statement by a disinterested third party as to the conversation between Mrs. Hughes and O'Brien. We do not know the source of the hearsay report to Mr. Robinson or the name of the disinterested third party. If, as claimed, the jury should find there was an express warning of falsity of the challenged statements, then as we next point out, we cannot say that plaintiff is not entitled to a further jury determination of whether the hearsay report was sufficient to provide immunity from liability for want of "actual malice."

The affidavits indicate that Mr. Robinson was general advertising manager in 1968 as well as in 1966. At the time of his affidavits in 1970 he was general manager.[2]

In view of the above facts and the requirement that we interpret the evidence in the light most favorable to the nonmoving party, we must conclude that there is a jury

---

[2]In his affidavit of September 1, 1970, Mr. Robinson stated that he was general advertising manager of The Tacoma News Tribune in 1966 and was involved, "at least to a degree, in the handling of the 'Hughes letter' ad by The Tribune in 1966 . . ."

In his affidavit of August 27, 1970 he stated:

That at the time of the publication of the political advertisement complained of by plaintiff herein, affiant was the general advertising manager of The Tacoma News Tribune, and it was on his authority that the said advertising copy was ultimately approved for publication.

question on the issue of whether O'Brien gave specific notice to Mr. Robinson that the ad was false. It follows that the affidavits and the depositions presented a genuine issue of material fact as to whether The Tribune Publishing Company acted with "actual malice" in the publication of the Hughes letter ad in 1968. In doing so we find that there is a jury question as to whether there is clear and convincing proof that The News Tribune published the ad with a reckless disregard of whether it was true or false.

We think the ad was clearly defamatory and since the jury could find that the paper was advised that it was false, in the preceding campaign, there is a jury question as to whether they were required to investigate more fully, even under the liberal *New York Times* rule as enunciated by *Rosenbloom*. This conclusion is bolstered by the fact that this was not "hot news" which would allow less time for investigation. *See Miller v. Argus Publishing Co., supra.*

With respect to defendant Chase, O'Brien's deposition and affidavit alleges that he specifically advised Chase about 10 days before publication of the ad that the statements in the ad were not true. He requested that Chase investigate the sources of his information and check the veracity of the people he was relying upon for the information contained in the ad. O'Brien stated that Chase at first disclaimed knowledge of the ad and later stated that he knew of such an ad but didn't have anything to do with it, that the "Democrats for Chase" people were going to run it in the newspaper. O'Brien then stated that in the 1966 campaign, the opposition used "the same dodge, *i.e.* 'Democrats for Mahler', to hide behind libelous political ads." This was an obvious reference to the "Hughes letter" ad published by The Tacoma News Tribune in 1966 over the banner of "Democrats for Mahler."

O'Brien contends that there was no organization of "Democrats for Chase" and that Turner, who signed the ad, worked very closely with Chase in all aspects of the campaign. From all of the evidence the jury could find that Chase relied upon Turner to check the statements in the ad

for reliability, and that Turner was acting for and with Chase in all aspects of the publication of the ad in question. The ad was prepared by the public relations firm representing the Chase campaign committee and paid for with funds of that committee. Since Turner was, in essence, the alter ego of Chase, it could be inferred that Turner was well aware of the warning to Chase that the statements in the ad were not true. No investigation of the truth of the allegations in the Hughes letter was conducted by either Chase or Turner prior to the publication of the ad.

We conclude that applying the clear and convincing evidence test, there was a genuine issue of material fact as to whether Chase and Turner published a defamatory falsehood with a reckless disregard for whether it was true or false.

Turning now to the question of whether defendants Franich and Puyallup Publishing Company, Inc. were properly included in the summary judgment, we find an important factual difference. Franich was not warned that the Hughes letter was false. Their liability would have to be predicated upon O'Brien's argument that Franich conspired with Chase and Turner to prepare an editorial which contained a defamatory falsehood. O'Brien points to the fact that Chase and Turner met with Franich several times during the campaign and Chase furnished him newspaper clippings which he ultimately used when the editorial was prepared. O'Brien buttresses this argument with the affidavit of Edward Kirchen that he saw the advertisement in an incomplete form about 10 days before the Franich editorial was published on October 23, 1968. The Kirchen affidavit was clarified, however, by a subsequent affidavit. In the last affidavit Kirchen explained the column entitled "The Facts" was centered in the incomplete ad. This verifies the statements of Turner and Chase that they did not know of the editorial until it appeared and then they immediately changed the proposed ad to move over "The Facts" column to the left to leave room for the editorial on the right. It is also consistent with the statements of Franich

that he did not plan an editorial until shortly before it was published and did not discuss the publication of an editorial with Chase and Turner.

It is not unusual for candidates and their campaign advisers to talk to newspaper editors, furnish them press clippings and hope for a favorable editorial. There is no substantial evidence of a conspiracy.

The editorial did contain a reproduction of the Hughes letter and incorrectly stated that it was printed in several major daily newspapers. According to O'Brien it was printed in only The Tacoma News Tribune as a political ad on one occasion in the 1966 campaign. There is nothing in the evidence to show that Franich knew that his statement was an error. He was careless in investigating the facts. His sole investigation related to checking with the county clerk's office with reference to the lawsuits against O'Brien. He relied upon information he had obtained from the clippings furnished him and his own recollection of the facts. His testimony and the general tenor of the editorial reveals that he felt it was wrong to spend "around $20,000" a year of the taxpayers' money while O'Brien worked in other employment and spent time campaigning. He was apparently not aware of the fact that the other employment consisted of finishing work on cases already started. The Hughes letter was added to his main objective of exposing what he considered to be an improper expense to the taxpayers.

Even though we consider all inferences in the light most favorable to the nonmoving party in a summary judgment, we cannot find clear and convincing evidence of "actual malice" in the publication of the editorial by Franich. If we were to apply the reasonably prudent man test we could find an inference of a reckless disregard for the truth or falsity of the Franich statements. As stated in St. Amant v. Thompson, 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968), the determination of what is a reckless disregard for the truth or falsity of a statement is governed by the necessity to prove by clear and convincing evidence that

defendants entertained serious doubts as to the truth or falsity of the defamatory publication. A clear warning from O'Brien that the statement was not true would have furnished an objective manifestation which would logically create serious doubts as to the truth or falsity of the statement. This would have required Franich to investigate the facts more carefully. *See Miller v. Argus Publishing Co.,* 79 Wn.2d 816, 490 P.2d 101 (1971).

The summary judgment is affirmed as to defendants Franich and Puyallup Publishing Company. The summary judgment is reversed as to defendants Chase, Turner and The Tribune Publishing Company and the cause is remanded for trial.

PETRIE, C.J., and HOROWITZ, J., concur.

Petition for rehearing denied July 25, 1972.

Review denied by Supreme Court November 8, 1972.

Appendix A

(Political Advertisement)

## Who is O'Brien?

## Why is HICKS paying this man nearly $20,000 a year of your taxpayer's MONEY??

### The Facts:

From April, 1967, to December 31, 1967—Congressman Floyd Hicks paid a Tacoma resident, Robert W. O'Brien, a salary of over $500 per month. During this same time, O'Brien worked in the office of a local attorney while living in Tacoma the year around.

*Pierce County Herald and Puyallup Valley Tribune reprint of the October 23, 1968, front page editorial by publisher, Frank Franich—"Maggie's Different, But . . . .*

### Hicks' Campaign Costly To Taxpayers..."

When Seattle Times reporter William W. Prochnau, Washington D. C. Bureau Chief, wrote in the Sunday, Oct. 6 issue that the election expense law was a joke, he wasn't kidding. Prochnau brought to light the fact that incumbent senators and congressmen often use public paid assistants for campaign work. He pointed

Who Is O'Brien? If he was a "district representative," why didn't we ever see him? How could he possibly hold down a clerk's job and still be worth over $500 per month of the taxpayer's money? Why is this man being sued right now by two different parties for allegedly representing himself to be a lawyer when he is not? (Pierce County Cause Numbers 181663 and 181730).

On January 1 of this year, Congressman Hicks increased O'Brien's salary to over $1,500 per month or nearly $20,000 per year. For what? Why is this man O'Brien, who was worth over $500 per month yesterday for doing nothing, suddenly worth $20,000 of your taxpayer's money just because it's an election year?

There is something wrong about this relationship, and the voters of the Sixth District deserve answers. It's your money. He's your Representative.

out 6th District Congressman Floyd Hicks as one who "has James Hansen on the staff and in addition has a full-time government paid "district" aide who devotes much, if not most, of his time to political campaigning."

In checking further, records show Hicks' two aides each on the government payroll of around $20,000 per year and have been left on the payroll during the campaign. More records show one of Hicks' aides, Robert O'Brien, had another job with private industry last year while still on Hicks' payroll. On top of this, he lived in Tacoma all year long.

In defeating Thor Tollefson in 1964, Hicks used as a major point of attack the fact that Tollefson's wife was on a government payroll.

Going back to Seattle Times writer Prochnau's story, he said, "Sen. Magnuson, however, has taken the unusual and laudable step of taking two of his top assistants off the government payroll this fall. The Senator's top assistant Gerald Grinstein, a $25,000 per year man, and

Robert Ginther, a $18,600 aide, have been paid out of Maggie's campaign fund.,"

In investigating this not too popular fact, that government paid aides are actually used on campaigns, additional information revealed that Hicks' aide O'Brien, while still on government payroll, was involved in private enterprise and in fact has two lawsuits pending against him for allegedly representing himself as an attorney . . . when in fact he was not.

Both of these lawsuits, which were reported in a summer issue of the Tacoma News Tribune, have been deferred by the judge (who is Hicks' replacement on the bench) until after the general election.

The same Hicks aide was the center of controversy during the 1966 election when, according to a public letter written by Mrs. I. L. Hughes of Bremerton and printed in several major daily newspapers, that he, O'Brien, threatened she and her husband when they replaced a Hicks sign from their property in front of their place of business with a sign for George Mahler.

In that letter, Mrs. Hughes wrote, "Mr. Robert O'Brien, who is Mr. Hicks' administrative assistant and is paid by our tax dollars, came into our store with another representative of Mr. Hicks. He proceeded to talk to me in a very rough manner concerning the removal of the Hicks sign. When I explained to him that my husband was at the present time in Washington, D. C. on business concerning a government contract we have, he threatened me to this extent: He stated to me that we had a government contract, indicating that ours would be terminated. Also, he said we would be very sorry for the change of signs and that he was going to the nearest phone immediately and phone Washington, D. C. and make sure that my husband would be most unwelcome in Hicks' office from this time on."

We question the use of government paid personnel for campaigning purposes. We applaud Sen. Magnuson for his integrity in this manner, but question even more strongly the undesirable methods used by Congressman Hicks.

# DEMOCRATS FOR CHASE

Coordinators: Mr. and Mrs. Richard D. Turner, Mr. and Mrs. Reuben Johnston, 1019 Green Way, Tacoma

128

# Editorial

Maggie's Different, But....

# Hicks' Campaign Costly To Taxpayers...

When Seattle Times reporter William W. Prochnau, Washington D.C. Bureau Chief, wrote in the Sunday, Oct. 6 issue that the election expense law was a joke, he wasn't kidding.

Prochnau brought to light the fact that incumbent senators and congressmen often use public paid assistants for campaign work. He pointed out 6th District Congressman Floyd Hicks as one who "has James Hansen on the staff and in addition has a full-time government paid "district" aide who devotes much, if not most, of his time to political campaigning."

In checking further, records show Hicks' two aides each on the government payroll of around $20,000 per year and have been left on the payroll during the campaign. More records show one of Hicks' aides, Robert O'Brien, had another job with private industry last year while still on Hicks' payroll. On top of this, he lived in Tacoma all year long.

In defeating Thor Tollefson in 1964, Hicks used as a major point of attack the fact that Tollefson's wife was on a government payroll.

Going back to Seattle Times writer Prochnau's story, he said, "Sen. Magnuson, however, has taken the unusual and laudable step of taking two of his top assistants off the government payroll this fall. The Senator's top assistant Gerald Grinstein, a $25,000 per year man, and Robert Ginther, a $18,600 aide, have been paid out of Maggie's campaign fund."

In investigating this not too popular fact that government paid aides are actually used on campaigns, additional information revealed that Hicks' aide O'Brien, while still on government payroll, was involved in private enterprise and in fact has two lawsuits pending against him for allegedly representing himself as an attorney . . . when in fact he was not.

Both of these lawsuits, which were reported in a summer issue of the Tacoma News Tribune, have been deferred by the judge (who is Hicks' replacement on the bench) until after the general election.

The same Hicks aide was the center of controversy during the 1966 election when, according to a public letter written by Mrs. I. L. Hughes of Bremerton and printed in several major daily newspapers, that he, O'Brien, threatened she and her husband when they replaced a Hicks sign from their property in front of their place of business with a sign for George Mahler.

In that letter, Mrs. Hughes wrote; "Mr. Robert O'Brien, who is Mr. Hicks' administrative assistant and is paid by our tax dollars, came into our store with another representative of Mr. Hicks. He proceeded to talk to me in a very rough manner concerning the removal of the Hicks sign. When I explained to him that my husband was at the present time in Washington D.C. on business concerning a government contract we have, he threatened me to this extent: He stated to me that we had a government contract, indicating that ours would be terminated. Also, he said we would be very sorry for the change of signs and that he was going to the nearest phone immediately and phone Washington D.C. and make sure that my husband would be most unwelcome in Hicks' office from this time on."

We question the use of government paid personnel for campaigning purposes. We applaud Sen. Magnuson for his integrity in this manner, but question even more strongly the undesirable methods used by Congressman Hicks.