[No. 2267-1.    Division One.    December 9, 1974.]

FREDERICK B. EXNER, *Appellant,* v. AMERICAN MEDICAL
ASSOCIATION *et al., Respondents.*

*Frederick B. Exner,* pro se.

*Detels, Draper & Marinkovich, Frank W. Draper, Williams, Lanza, Kastner & Gibbs,* and *Peter E. Peterson,* for respondents.

CALLOW, J.—The plaintiff, Dr. Frederick Exner, brought suit claiming he had suffered damages from allegedly de-

famatory statements made in an article by the defendant Goulding, Director of Public Information for the American Dental Association. The article appeared October 1965 in the American Medical Association's journal, "Today's Health," and is published as an appendix to this opinion save for those deletions which could be made in the interest of brevity without affecting the substance and flavor of the article.

### HISTORICAL BACKGROUND

For a number of years there has been a great deal of controversy over the fluoridation of public water supplies as a dental health measure. The plaintiff has been an active opponent of fluoridation for over two decades and has, by his own statement, devoted considerable time, effort and resources to this cause. He has written books and magazine articles, lectured, and participated in court actions, both as a litigant and as an expert witness, on the subject of fluoridation. The American Dental Association and the American Medical Association have been in favor of fluoridation.

### PLEADINGS AND PROCEEDINGS

The plaintiff's complaint claimed that the defendants conspired to defame him by publication of the article. The defendants denied that the statements were defamatory and raised state and federal constitutional protections of free speech in defense. The plaintiff was represented by counsel during the early stages of the proceedings but has represented himself during the hearing on the motions for summary judgment brought by the defendants and on this appeal. Following a hearing on the motions, a consideration of the depositions and other evidence presented, and the argument of counsel and the plaintiff, the trial court concluded the article itself was not defamatory. The trial court also held that the evidence presented was insufficient to support a determination that the defendants published the article with knowledge that it was false or with reckless disregard of whether it was false or true. The plaintiff

claims that summary judgment should not have been granted as genuine issues of material fact were involved.

## WAS THE ARTICLE DEFAMATORY?

The initial examination that must be made is whether or not the article was defamatory. Its introductory paragraphs make it clear that its purpose is to discuss and evaluate the motives of the opponents of fluoridation. These paragraphs state that the people to be discussed "range from the sincere to the charlatan, from the confused to the quack." The writer, having planted this prologue in the mind of the reader, then proceeds to a discussion of the motives behind several factions of the opposition to fluoridation.

Following a paragraph on the attitude of some chiropractors towards fluoridation, the writer then states that the plaintiff is "Perhaps the most frequently quoted 'professional' opponent to fluoridation . . ." The plaintiff asserts that the use of the term "professional" was libelous. The term "professional" can mean many things. It can be construed as sarcasm or to be complimentary. We note that the dictionaries do not recognize a sarcastic implication. In this case, the word could be interpreted as calling the plaintiff "professional" in terms of his background as a medical practitioner, or in his fulltime devotion of his energies to resisting fluoridation, or in the manner in which he had successfully opposed fluoridation proposals. The reader might give the term any one of these constructions even though it has been placed in quotes in the article. Terms, however, should be construed in the sense in which they would ordinarily be understood. *McNair v. Hearst Corp.*, 494 F.2d 1309 (9th Cir. 1974); *Amsbury v. Cowles Publishing Co.*, 76 Wn.2d 733, 458 P.2d 882 (1969); *Purvis v. Bremer's, Inc.*, 54 Wn.2d 743, 344 P.2d 705 (1959). When the reader is left to decide for himself whether the term "professional" is meant to imply that the person referred to is in a profession such as medicine, law, the clergy or the military, is totally committed to his cause, is expert and businesslike, or is a practitioner of the "world's oldest pro-

fession"—resolving any ambiguity in favor of a disparaging connotation is not justified. The apparently intended meaning was to denote the plaintiff as a completely devoted but overly zealous opponent. This could be taken by some as uncomplimentary, but the implications were not defamatory. *Dowling v. Livingstone*, 108 Mich. 321, 66 N.W. 225 (1896).

The plaintiff next challenges the use of the word "Exner's" being substituted in parentheses for the word "these" with respect to the discussion of the reviews of the book he co-authored on the hazards of fluoridation. It is true that the book reviews attacked the book forcefully. The defendant-writer of the article likewise attacked the ideas and results achieved by the plaintiff in his opposition to fluoridation. The opinions expressed in the book reviews and the comments of the defendant in the article were justified even though the statements were fuel adding to the "heat of the kitchen" to which the plaintiff has exposed his beliefs. The comments in the article on the book reviews amount to no more than reiteration of the criticism voiced by the reviewers of the book. These comments did not result in defamation. If it were otherwise, every book reviewer who found fault with an author's performance rather than applauding his work would be subject to suit. Reviewers who attack the contents of a literary work, as these reviewers did, rather than engaging in personal villification cannot be held to have defamed the author. *Merivale v. Carson*, [1887] 20 Q.B.D. 275; *Bearce v. Bass*, 88 Me. 521, 34 A. 411 (1896). Authors are not entitled to protection for a thin skin, and critics are not required to tread lightly. It follows that neither are those who only report what such a reviewer has said. *Fisher v. Washington Post Co.*, 212 A.2d 335 (D.C. App. 1965); *Fitzgerald v. Hopkins*, 70 Wn.2d 924, 425 P.2d 920 (1967); 3 Restatement of Torts §§ 606, 609 (1938); 1 F. Harper & F. James, *The Law of Torts* § 5.28 (1956).

The allegation that Dr. Exner was defamed because he was mentioned along with others who may have been char-

acterized in a disparaging manner in the article is not defamatory towards him of itself and does not indicate malice specifically directed towards him. The article did not condemn all who opposed fluoridation in a derogatory manner but separately commented upon each group of opponents to fluoridation and proceeded to analyze the considerations that impelled each group. We find that the article, while attempting to cast doubt upon the soundness of the concepts espoused by the plaintiff, did not attempt to personally disgrace him or diminish the esteem in which he was held in the community. It is true that a reader of the article might be persuaded that the position of the plaintiff on the subject of fluoridation was wrong. This does not amount to defamation, however, even though rejection of one's theories by others does not enhance that person's reputation. *See Walker v. D'Alesandro*, 212 Md. 163, 129 A.2d 148, 64 A.L.R.2d 231 (1957); *Cohen v. Cowles Publishing* Co., 45 Wn.2d 262, 273 P.2d 893 (1954), and the cases discussed therein.

The article did mistakenly report that of those members of the King County Medical Society voting in a poll on the subject, 706 were for fluoridation and 68 were against. The actual vote was 595 in favor and 166 against fluoridation. There is no evidence that this mistake was other than inadvertent or that it was material. This apparently unintentional mistake does not indicate malice.

The article finally proceeds to attack on a more personal basis others who opposed fluoridation and then states that those who have fought fluoridation (characterizing *some* as "convicted quacks, or hate mongers, or food fadists") have fought fluoridation with astonishing success. The article concludes that the scientists, health agencies, family physicians, and dentists who have supported fluoridation have been beaten not because of any question about the effectiveness or safety of fluoridation but because "men like this have been able to confuse, frighten, and mislead." These

statements were not directed against the plaintiff specifically and did not malign him personally.

We consider the article to have commented fairly on the plaintiff's position on fluoridation and not to have attacked his personal character or medical competence. The defendants were privileged to do so, and the article was not defamatory.

### WAS THE PLAINTIFF A PUBLIC FIGURE?

We find that the action of the trial court is supportable as well on the ground that the plaintiff was a "public figure" and failed to show malice towards himself in the publication of the article. We turn to a discussion of this ground for summary judgment for the defendants.

During the hearing on the motions for summary judgment, the following colloquy took place:

> THE COURT: . . . I will consider first the question: Is Dr. Exner a public figure as a matter of law? If Dr. Exner is not a public figure as a matter of law, then there are different consequences than if he is a public figure as a matter of law.
>
> DR. EXNER: May I suggest I am most definitely a public figure.

In a deposition considered by the court, the plaintiff stated: "I am regarded all over the world as the world's best informed authority on the fluoridation fraud." The evidence before the trial court on the motions reflected that the plaintiff had been vigorously involved in fluoridation controversies since 1952, locally, nationally and internationally. Fluoridation is a public issue which has been before the voters in numerous areas of the United States, is a matter of public interest and, as to that issue, the plaintiff forcefully and voluntarily placed himself in the public spotlight.

■ A person's claim that he is a public figure does not make him so. He must have become one from his participation in public matters. It is only then that he loses his safety from libel and slander unless malice accompanies the act. The categorization of a person as a public figure may

rest on either of two alternative bases. It was recently stated:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997, 3013 (1974). Here, the defendant is not universally famous but is well known among those involved in the argument over fluoridation. It is within this orbit that the plaintiff has cast aside his mantle of privacy.

When citizens voluntarily expose themselves to the limelight, they may become public figures. In addition to showing dissemination of a falsehood and resultant damage, public figures must show that the publication was made knowing it was false or with reckless disregard as to whether it was true or false. *Gertz v. Robert Welch, Inc.*, *supra*; *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967); *Associated Press v. Walker*, 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967); *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964); *Tilton v. Cowles Publishing Co.*, 76 Wn.2d 707, 459 P.2d 8 (1969).

*Gertz* further discusses the interplay between the need for free discussion of public issues protected by the First Amendment and the right of persons to protect themselves from defamation thusly on pages 342-43:

> Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. This

standard administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test. Despite this substantial abridgement of the state law right to compensation for wrongful hurt to one's reputation, the Court has concluded that the protection of the *New York Times* privilege should be available to publishers and broadcasters of defamatory falsehood concerning public officials and public figures.

Private citizens do not become public figures subject to damaging falsehoods concerning their lives without recourse when they are suddenly thrust into the news by events. When chance and the news media bring a private citizen into the public eye, the right to redress for defamation is not diminished so long as their notoriety was not of their own choosing. The right to recover damages for the dissemination of untruths about themselves without proving actual malice by the disseminator is retained. Even though the statements made concern matters of public interest, the right to be left alone is not lessened for the private person. *See Time, Inc. v. Hill*, 385 U.S. 374, 380, 17 L. Ed. 2d 456, 87 S. Ct. 534 (1967). The requirement of proof of malice of *New York Times Co. v. Sullivan* does not extend to private individuals who have not risen to public renown by their own activity. *Gertz v. Robert Welch, Inc., supra.*

*Miller v. Argus Publishing Co.*, 79 Wn.2d 816, 490 P.2d 101 (1971), relying upon *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971), indicated that one could be placed into the "public figure" category when the comment about him involved a subject of general public interest. The *Rosenbloom* case had enlarged the area of open comment under the First Amendment to include not only persons who were public officials or public figures but also those whose private lives were

suddenly embroiled by chance in matters of public interest. *Rosenbloom* has now been modified by *Gertz v. Robert Welch, Inc.,* which stated on page 345:

[T]he communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual. He has not accepted public office or assumed an "influential role in ordering society." *Curtis Publishing Co.* v. *Butts,* . . . He has relinquished no part of his interest in the protection of his own good name, and consequently he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood. Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery.

*Rosenbloom,* the basis espoused in *Miller* for restricting defamation suits by private citizens incidentally involved in public matters by requiring proof of malice, has now been limited by *Gertz* on the side of permitting legal recourse against the news media to the nonparticipating innocent bystander. It follows that private individuals who have not become public figures may now protect their reputations in state courts by legal remedy without proof of malice and that the mandate of *Miller v. Argus Publishing Co.* is likewise modified. *See Gertz v. Robert Welch, Inc., supra.*

The plaintiff, however, is not embroiled in the fluoridation controversy just by commenting on a matter in which there is public interest, but he has taken upon himself the role of attempting to order society insofar as the fluoridation issue was concerned. *Curtis Publishing Co. v. Butts, supra.* As to this issue, we note the apropos words of *Gertz* on page 352:

Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public

personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.

The plaintiff was a public figure in regard to the limited issue of fluoridation by having abandoned his anonymity, by having assumed leadership and by having attempted to influence the outcome of the issue. The reporters of these activities could write freely about this aspect of the plaintiff so long as they did not write with malice. *See Amsbury v. Cowles Publishing Co.*, 76 Wn.2d 733, 458 P.2d 882 (1969).

### SUMMARY JUDGMENT

■ Summary judgment is to be granted in defamation cases as in other cases only when there is no genuine issue as to a material fact. *McDonald v. Murray*, 83 Wn.2d 17, 515 P.2d 151 (1973). Likewise, as in other cases, the evidence presented must be considered in the light most favorable to the nonmoving party. *Amsbury v. Cowles Publishing Co.*, *supra*; *Hudesman v. Foley*, 73 Wn.2d 880, 441 P.2d 532 (1968); *O'Brien v. Tribune Publishing Co.*, 7 Wn. App. 107, 499 P.2d 24 (1972); *Diel v. Beekman*, 1 Wn. App. 874, 465 P.2d 212 (1970). However, the function of the trial court in ruling on a defense motion for summary judgment in a defamation action is to determine if the plaintiff's proffered evidence is of a sufficient quantum to establish a prima facie case with convincing clarity. Unless the plaintiff has done so, the motion must be granted. *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 19 L. Ed. 2d 248, 88 S. Ct. 197 (1967); *New York Times Co. v. Sullivan, supra*; *Chase v. Daily Record, Inc.*, 83 Wn.2d 37, 515 P.2d 154 (1973).

To show that the defendant acted with reckless disregard for the truth or falsity of a statement, the plaintiff must submit evidence pursuant to CR 56 that the defendant entertained serious doubts as to the truth of the publication and published anyway. *St. Amant v. Thompson*, 390 U.S.

727, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968); *Tilton v. Cowles Publishing Co., supra.* The proof before the trial court failed to establish malice with convincing clarity. It is the duty of a reviewing court to examine the total record to ascertain whether there exists convincingly clear evidence of malice. *Mellor v. Scott Publishing Co.,* 10 Wn. App. 645, 519 P.2d 1010 (1974). When the affidavits, admissions, exhibits and depositions submitted by the parties are considered in the light most favorable to the plaintiff, the record is lacking in proof of malice on the part of the defendants except for the unsupported allegations of the plaintiff that malice existed. This is not sufficient to survive the challenge of summary judgment in a defamation case brought by a public figure. *Time, Inc. v. Hill, supra.* The plaintiff's evidence advanced him no further than his pleadings and failed to establish a knowledge or high degree of awareness of the probable falsity of any statement in the article with convincingly clear proof.

The summary judgment of dismissal is affirmed.

SWANSON, C.J., and HOROWITZ, J., concur.

Petition for rehearing denied December 31, 1974.

Review denied by Supreme Court February 25, 1975.

### APPENDIX

The article entitled *Why Doctors Vote Yes to Fluoridation* by Peter C. Goulding, Director, Bureau of Public Information, American Dental Association, reads in part:

Is FLUORIDATION of public water supplies an effective method of reducing tooth decay? Yes—says every authoritative health and scientific organization in the country—the American Medical Association, the American Dental Association, the American Association for the Advancement of Science, and the U.S. Public Health Service —plus fully 99 percent of the 250,000 physicians and 100,000 dentists in this country.

. . .

Despite this overwhelming vote of confidence from virtually every medical, dental, and scientific authority in our nation, and, indeed the world . . . fluoridation loses heavily in the ballot boxes of the American public. Evolving as a political rather than a scientific issue, fluoridation has been passed in only 334 of 852 community referendums during the past 15 years. . . .

How can this possibly happen?

First of all, perhaps, because no one ever died of dental decay. Secondly, and certainly most significantly, because the issue of fluoridation is being grossly misrepresented to the American public by a shouting few. Specifically, the voters are being swayed in their thinking by the loud and persistent shouts of "poison." . . . On this issue, therefore, the most important question the voter must resolve is whether there is validity to the dissenter's loud and persistent shouting.

The House of Anti-Fluoridation has many rooms. Residents range from the sincere to the charlatan, from the confused to the quack. Motives vary. Some are cautious, sincere individuals; others have an axe to grind. Methods vary too. Some would present their case only in print and at a high level. Others love a political battle and use emotional arguments exclusively.

. . .

The sincerity of pamphleteers—the so-called political crusaders —is more difficult to judge. There still may be individuals who believe that fluoridation is part of a gigantic conspiracy, that fluorides are poisonous in any amount, and that their individual liberties are being violated. When sincere, such views usually are held by people who have been thoroughly misguided.

On the other hand, many of these alleged crusaders tie the emotion-charged fluoridation controversy to other campaigns of fear, hate, and prejudice. Extremist political agitators very often add attacks on fluoridation to their many wild charges against the social order. In short, they use the issue to sell pamphlets and their own particular social and political quirks.

Motivations of health food faddists—devotees of health foods who consistently wage vigorous campaigns against fluoridation—are more easily analyzed. For some, the issue runs counter to their preachments on "purity" of water. Others are in the business of selling health foods and the resultant publicity from their attacks on fluoridation does not hurt their business one bit. Some of them are also opposed to pasteurization and vaccination.

. . .

In addition, there are perhaps a handful of physicians and dentists who oppose fluoridation. Often, they regard it as part of a larger picture of "creeping socialism," even though the decision to fluoridate a water supply remains wholly within the individual community. So be it. There are also physicians who are still opposed to vaccination and pasteurization.

Perhaps the most frequently quoted "professional" opponent to fluoridation is Dr. Frederick B. Exner of Seattle, Washington. Having written a book on the subject, he has taken part in court suits; he has brought suit himself; he has spoken in many parts of the nation in opposition to fluoridation.

In reviewing the book, *American Fluoridation Experiment*, published in 1957, which Doctor Exner co-authored with Dr. G. L. Waldbott, the Royal Society of Health found: "This book cannot be

recommended to the reader in search of an objective evaluation of fluoridation, although it will certainly offer an attraction to those interested in the extremes of subjective criticism . . . Readers who seek a verification of (Exner's) charges will fail to find it. Instead, they will find a strange melange varying from vague generalities to downright misstatements."

In its review of the book, the *Rocky Mountain Medical Journal* noted that it "plunges into a subject that is only vaguely concerned with the special practice of either of the authors . . . This is one of the most peculiar books ever to be offered for serious consideration, either by scientists or lay persons.

"One of the authors attempted to show in a published report that a pronounced stain had been produced in two persons, who, it was alleged, were raised on Denver South Platte water—which consistently has contained one part per million fluorides," the *Journal* review continues. "In a court of law in another state, sometime over a year ago, it was determined that these two persons had acquired the stain, not in Denver, but in other communities where the water held an 'excess of fluoride.'

"This episode is mentioned here only because the book stubbornly retains this 'evidence' despite its rejection by a court of law . . . There is hardly a paragraph in the book with which informed opinion could agree," the *Journal* concludes.

Doctor Exner's own medical organization, the King County (Washington) Medical Society, voted 706 to 68 for fluoridation.

Doctor Exner's opposition has been equally unacceptable in the courts. Despite testimony against the measure, a Washington State lower court and the State Supreme Court upheld fluoridation. Instituting a suit against the Fluoridation League of Chehalis, Washington, he attempted to obtain $1,000 which the group had offered to anyone able to prove that fluoridation at one part per million caused any ill effects. The court rejected his plea.

Doctor Exner also testified in a court case in Chicago in which fluoridation was again upheld.

Another frequently cited "professional" opponent of fluoridation, "Doctor" E. H. Bronner, was no doctor of medicine at all. Speaking in many cities at the invitation of various anti-fluoridation groups, he persuaded the city council of Clinton, Iowa, to vote against fluoridation. After he had left, the city's newspaper, the *Clinton Herald,* became curious enough to investigate the "doctor's" record. It turned out that Bronner was at that time an escapee from a mental institution, the Elgin State Hospital in Elgin, Illinois. Bronner is one of the reasons why the city of Seattle, Washington, does not now have fluoridation.

Other opponents to fluoridation have equally questionable credentials. Take for example the widely quoted Oliver Kenneth Goff. A former Communist by his own admission who "knows all about them," he has authored a book called *Brain Washing,* which was published by Defenders, Incorporated. Established by Gerald Win-

drod, this enterprise also publishes the *Defender* magazine, which is characteristically anti-medical, anti-Communist, anti-Catholic, and anti-Jewish. This organization has championed such useless cancer treatments as the Koch preparation, the Hoxsey treatment, and the "Laetrile" treatment. Goff has been connected with the group, in the past at least.

. . .

All of these men—some of whom are expert only as convicted quacks, or hate mongers, or food faddists—all of them have fought fluoridation, with astonishing success. They have beaten the scientists and the health agencies; they have beaten your family physician and dentist. Fluoridation has lost, not because of any question about its effectiveness or safety but because men like this have been able to confuse, frighten, and mislead.

Presently, more than 56 million persons are drinking water with the proper amounts of fluoride in it. Hopefully, your children number among them. However, in communities where this issue—cited as the most proven measure in the history of public health—remains to be settled, the ultimate decision rests with the voting parents. Your physician and your dentist urge that you vote "yes" to fluoridation.